In re MARRIAGE OF JOANNE L. LICHTENSTEIN, Petitioner-Appellant, and LORRY A. LICHTENSTEIN, Respondent-Appellee (David Grund, Contemnor-Appellant).

Second District    No. 2—93—0083

Opinion filed July 22, 1994.

David I. Grund and Richard S. Zachary, both of Grund & Nadler, P.C., of Chicago, for appellant.

Michael W. Kalcheim and Andrew D. Eichner, both of Kalcheim, Schatz & Berger, of Chicago, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Petitioner, Joanne Lichtenstein, appeals from an order denying her petition for an order of protection against respondent, Lorry Lichtenstein. Joanne's attorney, David Grund, appeals from an order finding him in contempt of court and imposing a sanction.

Joanne filed a petition for dissolution of her marriage to respondent on September 19, 1990. On October 10, 1990, she secured an *ex parte* order of protection in the wake of an incident in which Lorry allegedly pushed her down a flight of stairs, causing her multiple injuries. However, on October 18, 1990, following negotiations, an agreed order was entered withdrawing Joanne's petition for an order of protection but granting her exclusive possession of the parties' marital residence.

Over the next two years the parties filed a steady stream of petitions for rules to show cause and similar motions against one another, usually related to matters concerning the children or Lorry's failure to pay support or maintenance. Joanne secured another *ex parte* order of protection on March 18, 1991, but it was vacated two days later for lack of notice to Lorry. A joint parenting agreement, first reached in February 1992, was amended in September 1992 and attempted to resolve custody and parenting issues between the parties. Nevertheless, the hostility between them continued unabated. On December 4, 1992, Joanne filed still another *ex parte* petition for an order of protection, citing incidents that had occurred on November 18 and December 2, 1992. Two days later Lorry served a

petition for an order of protection of his own, alleging that he had been abused during the December 2 incident.

A hearing on the two petitions was held on December 7. Joanne and Lorry were the only witnesses who testified, and they gave widely conflicting versions of the two occurrences mentioned in the petitions. It is not disputed that Lorry had parenting time from 4 p.m. to 6:30 p.m. on November 18 and Joanne was supposed to drop the children off at Lorry's home. According to Joanne, she called Lorry around 3:30 p.m. to ask what his plans were for the children that day. Lorry responded by shouting obscenities at her, telling her to get the kids over to his place, refusing to say what he had planned, and telling her she would see the kids when she saw them. Finally, he hung up, but Joanne called him back and again he swore and yelled at her. Joanne testified that Lorry's voice was "slurred," that he was breathing heavily and salivating, and that he sounded out of control as he screamed at her. She became frightened and did not take the children for visitation. She did, however, take the children to her son's basketball game where Lorry was also in attendance. In contrast to Joanne's testimony, Lorry denied that he swore or yelled at her and testified that he did not breathe or salivate heavily on the phone. He testified that when Joanne called she demanded that he return the children early and threatened that if he did not she would seek help from the police. When he questioned her, Joanne hung up.

Both parties also testified regarding the episode on December 2. Lorry had the children for visitation that evening. When he returned to Joanne's residence with them, his six-year-old son, Richard, asked him to come see some changes he had made to his bedroom. Lorry went in the house, walked up the stairs, and looked in Richard's bedroom. He was met by Joanne on the stair landing, outside Richard's bedroom. Joanne testified that she told Lorry he was not allowed to come into the home without her permission and that he should leave. Lorry began verbally abusing her, calling her crazy and swearing at her. He began walking down the stairs and out through the kitchen to the side door, stopping every few steps to turn and swear at Joanne, who was following three or four steps behind him. According to Joanne, just as Lorry was leaving through the door he turned around, clawed at her face, and grabbed at her blouse, ripping the buttons off. She then pushed Lorry out of the house and slammed the door. On cross-examination Joanne stated that since the entry of the joint parenting agreement, Lorry had been in her residence "extremely rarely" to help the children with homework or play with them. On redirect examination, she indicated he had been there no more than six times, each time with her consent.

Lorry gave a very different version of what happened on December 2. When Joanne appeared on the stair landing near Richard's room, she immediately began badgering Lorry about his plans for the weekend visitation with the children. He told her he had no plans, but she began to get agitated and threatened that if he did not tell her his plans, he would not see the children. Rather than risk a confrontation, Lorry started walking down the stairs to leave the home. Joanne followed him, but he continued walking. According to Lorry, just after he got out the side door of the house Joanne came up behind him and yanked on the hood of the ski jacket he was wearing, spinning him around, and then socked him in the face. The jacket sustained a small rip where the hood was attached to the coat. Lorry went to his car and called the police to report a battery. On cross-examination Lorry admitted that he knew he did not have Joanne's consent to enter the house that evening. He added, however, that when he had asked for her consent in the past, he and Joanne had always worked something out for him to come to the home. According to Lorry, Joanne always left the door open and he always walked in, and there had never been a problem. He had been there the two nights before the incident helping his son with homework.

At the conclusion of the hearing, after finding that neither party had demonstrated that they qualified for an order of protection, the court entered an order denying both Joanne's and Lorry's petitions. However, the order also reaffirmed the October 18, 1990, order which granted Joanne exclusive possession of the residence and enjoined Lorry from verbally abusing Joanne and from using vile, profane language toward Joanne.

■ Joanne insists that the trial court's refusal to issue an order of protection on her behalf was improper and unwarranted. Under section 214(a) of the Illinois Domestic Violence Act of 1986 (Act), if the court finds that the petitioner has been abused, the court is to enter an order of protection prohibiting such abuse. (750 ILCS 60/214(a) (West 1992).) Among other things, the term "abuse" is defined as "physical abuse," "harassment," and "interference with personal liberty." (750 ILCS 60/103(1) (West 1992).) In her petition Joanne requested protection from all three of these. The trial court, which has broad discretion in determining whether abuse occurred under the Act, should evaluate the credibility of the witnesses, the conduct described, and the tension among household members. *In re Marriage of Blitstein* (1991), 212 Ill. App. 3d 124, 131; *In re Marriage of Hagaman* (1984), 123 Ill. App. 3d 549, 554.

■ The issue in this case rested squarely on the credibility of the witnesses, as the trial court expressly recognized. The judge referred

not only to what she observed on the witness stand, but also pointed out that she already knew something about the parties, having been involved in the case for at least two years. She described Lorry as excitable and as having a temper and said she knew Joanne to be rigid and nervous. Regarding the two incidents related at the hearing, she stated:

> "Because there are two different versions of the facts and because the personalities of the parties play into this being very much a product of both of their behaviors and both of their attitudes towards each other, it's very difficult to sort out who was the aggressor and who was responsible for what happened."

The judge made a number of similar comments indicating her perception that both parties contributed to each instance of conflict between them and were responsible for the results of that conflict. The court concluded that neither Lorry nor Joanne had sufficiently shown abuse to merit an order of protection. In our view the trial court properly exercised its discretion in denying Joanne's petition.

We have examined the report of proceedings of the hearing and find that it fully supports the lower court's remarks concerning the parties' respective personalities, attitudes, and conduct, as well as the court's observation that both parties must bear some responsibility for creating conflict. Judging from the record, it is little wonder the trial court had great difficulty in assessing the parties' credibility. Under the circumstances, we think the court acted well within its discretion in deciding that neither Joanne nor Lorry had shown the abuse which would warrant an order of protection.

We turn now to counsel's challenge to the finding of contempt entered against him. During cross-examination, Joanne's attorney, David Grund, asked Lorry to leave the witness stand and put on the ski jacket which had allegedly been ripped during the December 2 incident. Without any forewarning to the court, counsel then attempted to recreate Lorry's version of the occurrence by yanking on the hood of the jacket from behind. Lorry did not spin around, but the hood tore substantially at the seam, and the coat pulled off Lorry's arms. What ensued was mass confusion, with Lorry, Lorry's counsel, Grund, and the court all talking at once. Counsel for Lorry immediately objected, and Lorry himself began spontaneously and repeatedly addressing the judge, asking whether she had seen Grund's action. Lorry also addressed numerous comments directly to Grund, and the court repeatedly asked Lorry to sit down. In quick succession Lorry's counsel asked for a finding of direct contempt against Grund and a mistrial. Lorry kept interrupting, and his own attorney finally also told him to sit down. This heated exchange

continued, through approximately nine pages of transcript, until the judge regained control.

When the hearing continued, Grund explained that he had used the demonstration to impeach Lorry's credibility by showing that the incident could not have occurred as claimed by Lorry. In her oral pronouncement the trial judge said that there was no basis for believing that the force used by Grund in grabbing Lorry's jacket had anything to do with the force that had been used by Joanne, and there was no parallel between the results of Grund's act in court and Joanne's act on December 2. The court found Grund's demonstration to be irrelevant and indicated that Grund would have to pay for the coat as well as pay a fine. In its written order the court made clear that it found Grund to be in direct criminal contempt. Having referred to the incident at the time as "a great deal of almost hysteria," the court now called Grund's actions inappropriate, explaining that such behavior lessens the dignity of the court and noting that it had resulted in a substantial alteration of evidence. Grund was ordered to pay a $100 fine and to replace the jacket. The contemnor claims the trial court erred.

Criminal contempt consists of conduct which is calculated to embarrass, hinder, or obstruct a court in the administration of justice or to diminish its authority or dignity, or to bring the administration of law into disrepute. (*People v. Simac* (1994), 161 Ill. 2d 297, 307; *People v. Ernest* (1990), 141 Ill. 2d 412, 421.) A finding of criminal contempt is punitive in nature and is meant to vindicate the dignity and authority of the court. (*People v. Simac*, 161 Ill. 2d at 307; *Ernest*, 141 Ill. 2d at 421.) Intent or at least knowledge of the nature of one's act is an element of contempt since contempt requires some form of knowledge of what is forbidden. (*People v. Simac* (1992), 236 Ill. App. 3d 1096, 1102; *People v. Sheahan* (1986), 150 Ill. App. 3d 572, 574.) Direct criminal contempt occurs when the contemptuous conduct takes place in the presence of the judge, and all the elements of the offense are within the judge's personal knowledge. (*People v. Simac*, 161 Ill. 2d at 307.) The standard of review for direct criminal contempt is whether there was sufficient evidence to support the finding of contempt and whether the court considered only facts within its personal knowledge. (*Simac*, 161 Ill. 2d at 307, citing *People v. Graves* (1979), 74 Ill. 2d 279, 284.) Contemnor maintains that the evidence did not demonstrate the intent necessary to support a conviction of direct criminal contempt. We disagree.

The intent necessary for criminal contempt has been defined as a

voluntary act by one who knows or reasonably should be aware that his conduct is wrongful. (*People v. Griffith* (1993), 247 Ill. App. 3d 21, 23; *People v. Bertelle* (1987), 164 Ill. App. 3d 831, 833.) Where direct contempt is involved, an alleged contemnor's intent need not be proven affirmatively; it may be inferred from the conduct itself. (*People v. Simac*, 161 Ill. 2d at 307; *People ex rel. Kunce v. Hogan* (1977), 67 Ill. 2d 55, 60-61.) Intent may be inferred from proof of the surrounding circumstances and the character of the contemnor's conduct. (*People v. Simac* (June 16, 1994), No. 74843, slip op. at 7; *Ernest*, 141 Ill. 2d at 424.) For example, this court has said that contemptuous intent can be inferred from acts which common sense dictates will be considered contemptuous by the community or will create a disturbance in the courtroom. (*In re Watts* (1978), 66 Ill. App. 3d 971, 975; also see *Simac*, 236 Ill. App. 3d at 1096.) In light of the circumstances at the time, and the nature of his actions, we believe the contemnor knew or reasonably should have been aware that his demonstration would create a disturbance and disrupt the court proceedings.

If there is one thing that emerges clearly from the report of proceedings, it is the hostility that characterized the hearing on the parties' petitions. There was the underlying and pervasive bitterness and rancor between the spouses, as revealed in their respective testimony. Evidence was presented which indicated that this hostility had erupted into physical conflict in the past. Too, the record shows numerous instances of personal animosity between each spouse and the other spouse's counsel, during cross-examination. Finally, the record leading up to counsel's demonstration strongly suggests a kind of antagonism and acrimony between the parties' attorneys which exceeded a healthy adversarial spirit. All in all, the hearing appears to have been permeated by the ill feelings, and the resultant tension, existing amongst the various participants. Contemnor cannot have been oblivious to this charged atmosphere.

It was also apparent that Lorry was an impulsive individual, prone to inappropriate outbursts. At one point in the proceedings Joanne's counsel requested that he be admonished because his loud talking to his own attorney had become a distraction. At various times in the hearing he made unilateral remarks to the court or the attorneys. The court commented that, due to its long involvement with the case, she knew Lorry to be excitable and to have a temper and referred to his "exploding" in court. And, as contemnor well knew, Joanne had previously secured an order of protection based on allegations of physical abuse by Lorry.

■ Under all the circumstances, we opine that contemnor knew

or reasonably should have known that the demonstration he was contemplating carried with it the potential for provoking, at worst, a serious physical confrontation between himself and Lorry or, at the very least, precisely the disruption which actually occurred. Contemnor's common sense should have told him that, in an already tense and volatile environment, his conduct was likely to trigger a disturbance in the courtroom.

Moreover, the record is clear that Lorry's ski jacket was offered into evidence and that contemnor was aware of the rip in it at the time he asked Lorry to don the jacket. Once again, contemnor knew or reasonably should have been aware that the planned demonstration, by its very nature, could result in the destruction, or at least the alteration, of evidence and, thus, could hinder the court in its administration of justice.

Viewed as a whole, we find that the evidence was sufficient to demonstrate the intent required to support a conviction of direct criminal contempt. Consequently, the trial court did not err in entering such a conviction against contemnor.

Contemnor argues that his demonstration was merely a good-faith method of cross-examination meant to test Lorry's credibility and that to find him in contempt will have a chilling effect on the vital process of testing the truth of a witness' statements. We recognized this position in *Simac* (236 Ill. App. 3d at 1102), when we said:

> "When attorneys are charged with contempt during the course of making honest efforts to advance their clients' interests, a certain latitude is allowed regarding what is permissible conduct. Because an independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice, a stand taken by counsel in good faith and in the interest of his client should not ordinarily serve as a basis for a charge of contempt. (*People v. Kuelper* (1977), 46 Ill. App. 3d 420, 423, citing *In re Criminal Contempt of McConnell* (1962), 370 U.S. 230, 8 L. Ed. 2d 434, 82 S. Ct. 1288.)" (*Simac*, 236 Ill. App. 3d at 1102.)

Having said this, we added:

> "However, good-faith, vigorous advocacy cannot immunize all conduct undertaken by an attorney in behalf of a client [citation] and the latitude given attorneys as vigorous advocates does not extend to deceiving or manipulating the court [citation]." (Simac, 236 Ill. App. 3d at 1102.)

We do not think it extends, either, to destroying the integrity of evidence or creating a serious disturbance in the courtroom, both of which, in our view, hindered the court's functions and dignity. We think it worth repeating here our observation in *People v. Miller*

(1970), 130 Ill. App. 2d 637, 645, *rev'd on other grounds* (1972), 51 Ill. 2d 76, that, in order for the court to reach its goal of discovering the truth, and to ensure a fair trial to all litigants, "ancillary matters or disruptive practices must give way to an atmosphere of dignity, decorum and courtesy on the part of all parties involved."

For the reasons stated, the order of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS, P.J., and DOYLE, J., concur.