ROBBY JOE WILSON, Petitioner-Appellee, v. ERICA LASHAWN JACKSON, Respondent-Appellant.

Third District    No. 3—99—0383

Opinion filed April 20, 2000.

Joan C. Scott (argued), of Ewing & Scott, of Lewistown, for appellant.

Jeff L. Neigel (argued), of Sebo & Clark, of Canton, for appellee.

PRESIDING JUSTICE SLATER delivered the opinion of the court:

Respondent Erica Lashawn Jackson appeals from the orders of the trial court granting emergency, interim and plenary orders of protection in favor of petitioner Robby Joe Wilson. We reverse.

## Facts

Petitioner and respondent lived together from approximately September of 1997 to April of 1998. Shortly before they broke up, respondent became pregnant. According to respondent, she broke up with petitioner because he was overbearing, possessive and controlling. Petitioner did not want respondent to have friends, he would go through her drawers and purse and get mad when she locked the bathroom door. Respondent described an incident where petitioner cut his wrist with a razor blade after an argument. On another occasion, petitioner prevented respondent from calling the police by yanking the phone from its socket. He then picked respondent up and threw her down. Petitioner denied that this incident occurred. After respondent ended the relationship, petitioner would repeatedly call her at work to talk about getting back together. When respondent refused to reconcile with petitioner, he threatened to take her to court and get custody of the baby.

On December 9, 1998, a week before the baby was born, petitioner came to respondent's home. He had not been invited. According to petitioner, he had come to tell respondent that he wanted to be present at the child's birth and he wanted to be involved in the child's life. According to respondent, petitioner talked about getting back together. Respondent repeatedly told petitioner to leave, but he refused. Respondent grabbed petitioner and began pushing him out the door. Petitioner testified that he did not resist. Respondent testified that petitioner tried to push the door open and come back in. According to petitioner, respondent hit him in the face, chest and shoulders. Respondent admitted hitting petitioner's "hands and stuff" because he was trying to prevent her from closing the door.

On December 16, 1998, respondent gave birth to a son, Ansley Elijah Wilson. While she was in labor, respondent tried unsuccessfully to contact petitioner, and she eventually called petitioner's mother and informed her of the impending birth. Petitioner arrived at the hospital shortly after the baby was born. The next day, petitioner signed a document acknowledging paternity. Eight days later, on Christmas Eve, respondent allowed petitioner to take Ansley for an unsupervised

visitation. When the child was returned, he smelled of cigarette smoke and was congested. Thereafter, although no order of visitation had been entered by any court, respondent allowed petitioner to visit with Ansley, usually at her home, on or about January 2, 1999, January 7, January 14, January 25, February 13, February 16 and February 26.

On February 16, 1999, petitioner came to respondent's apartment for a prearranged visit with Ansley. Petitioner offered to give respondent $40 for some baby pictures, but respondent refused. According to petitioner, he told respondent that she should not keep saying that he did not do anything for the baby if she was going to refuse his offers. Respondent became angry and upset and screamed at petitioner, telling him to leave. Petitioner sat on the couch holding the baby, telling him how much he loved him. Respondent then "jerked" Ansley out of petitioner's hands and told him to leave.

According to respondent, after she refused the $40, petitioner started telling Ansley, "Your mother better never say that I haven't tried to give her anything" and, "Your mother is crazy" and, "Your mother needs to see somebody." She told petitioner to stop saying such things or leave. Petitioner then told respondent that he was going to take her to court and take the baby from her. Respondent told petitioner to give Ansley to her and he refused. After she said it again, he handed Ansley to her and eventually left.

A few days later, after talking to counselors and support groups, petitioner decided to obtain an emergency order of protection the next time he had possession of Ansley. He was scheduled to visit Ansley on Saturday, February 27, but respondent agreed to change it to Friday, February 26. After petitioner picked Ansley up, he filed a petition for an emergency order of protection. Petitioner alleged that respondent physically assaulted him December 9, 1998, and continually harassed, intimidated, exploited and manipulated petitioner and the child. Petitioner also asserted that on February 16, 1999, respondent screamed and used profane language and ripped Ansley from petitioner's hands. Petitioner also claimed that respondent deprived him of visitation with Ansley and had left him in the care of known drug and alcohol abusers. Petitioner further alleged that respondent had abused her other children. Following an *ex parte* hearing, the trial court issued an emergency order of protection placing Ansley in petitioner's care.

When petitioner did not return Ansley to respondent that evening, she telephoned petitioner. Petitioner told respondent that he would not be returning Ansley. According to respondent, when she asked why, petitioner stated, "You have hurt me so now it is my turn."

On Monday, March 1, 1999, respondent filed a petition for rehear-

ing pursuant to section 224(d) of the Illinois Domestic Violence Act of 1986 (Domestic Violence Act or the Act) (750 ILCS 60/224(d) (West 1998)). Respondent alleged that she had not received prior notice of the initial hearing in which the emergency order of protection was entered and that she had a meritorious defense to the order. Respondent denied petitioner's allegations and set forth her version of the events of December 9 and February 16.

On March 8, 1999, petitioner filed a petition for temporary custody, permanent custody and child support. This was not part of the domestic violence case, but was a separate action filed pursuant to the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (see 750 ILCS 5/601 (West 1998)) and the Illinois Parentage Act of 1984 (Parentage Act) (see 750 ILCS 45/6 (West 1998)). On the same day, a hearing was held on respondent's petition for rehearing. No report of proceedings of the hearing is contained in the record. The court's order stated that a home study should be conducted by the Department of Children and Family Services (DCFS) and that the court would request the study. The court ordered the parties to cooperate with the study and continued the matter until March 17.

On March 17 the parties agreed that, rather than continue the hearing on the petition for rehearing, they would proceed with the hearing on the petition for an order of protection because the emergency order expired that day. Petitioner called respondent as a witness and she testified about the events of December 9, 1998, and February 16, 1999, as previously described. Petitioner then testified to his version of the events occurring on those dates. He also testified that a visitation had been planned for February 20 but respondent canceled it on the 19th. Petitioner admitted that he could not give a date when respondent had ever left Ansley in the care of a drug or alcohol abuser. Petitioner also explained that he had claimed that respondent deprived him of his right to see Ansley because respondent would not agree to establish a regular visitation schedule.

After a recess, petitioner's attorney indicated that he had one more witness, but that he would accede to the request of respondent's attorney to call a witness out of turn. The court responded:

"THE COURT: Before we get to that, as I listened to testimony, I have been considering this, and I've, I guess my major concern is that I ordered there to be cooperation and that there would be a DCFS home study of both homes, and Ms. Scott [respondent's attorney] tells me she disagreed. It is a court order. I don't really care what your personal opinions are. Those concerns were never voiced, and I am not going to make a final determination until I have a home study of both homes.

So I'm going to continue the order of protection on an interim basis. I want that home study completed, and I want counsel to work out a shared arrangement regarding the child, and until I have that home study, I am not going to rule on anything so—

MS. SCOTT: Your Honor, I have many witnesses that I have subpoenaed here today.

THE COURT: Well, it is going to be continued over. Frankly, this was set, you know, the order says it is set on the motion for hearing. That is what it was set for, and if it had been the return date on the OP, you would have appeared, and it would have been set over for hearing anyway. And there has been a blatant disregard of my court order.

MS. SCOTT: I haven't done a thing.

THE COURT: You told me you disagreed, and you didn't find it appropriate.

MS. SCOTT: I disagree, but I haven't done a thing, Your Honor.

THE COURT: You haven't done a thing to get it accomplished either.

MS. SCOTT: You told me you were going to do that, Judge.

THE COURT: I said I would call DCFS. I called DCFS. Work out something as far as sharing.

MS. SCOTT: Your Honor, I need to be heard on the record.

THE COURT: I have made my decision. I have told you.

MS. SCOTT: Judge, you told me you were going to arrange—

THE COURT: I told you I would call DCFS. I called Lutheran and—

MS. SCOTT: And you said they would call us, *** and nobody has called us.

THE COURT: Well, I made my ruling."

The court then terminated the hearing on its own motion. Respondent subsequently filed a motion to reconsider the entry of the interim order of protection and the termination of the hearing. Respondent asserted that the evidence did not support entry of the interim order and that because only temporary custody can be awarded under the Domestic Violence Act, a home study was inappropriate and incompatible with respondent's right to a prompt hearing. Respondent also alleged that her attorney had not disregarded the court's order concerning the home study but had relied on the court's statement that it would make the arrangements. After a hearing, respondent's motion was denied.

On April 30, 1999, the hearing on the petition for an order of protection resumed. Petitioner presented no further witnesses. Respondent presented the testimony of Maggie Wright, a DCFS counselor, who testified that respondent's family members are close-knit,

loving and nonviolent. She had seen no evidence of drug or alcohol abuse by any member of the family. Tomeka Spencer, respondent's coworker at Associated Bank, testified that, beginning in October of 1998, petitioner would call respondent at the bank three or four times a day. Alisha Ross, another bank employee, testified that in January of 1998 petitioner called respondent at work seven or eight times per day. Petitioner would also call Ross at home to ask about respondent's whereabouts and whom she was with. Respondent also called three additional witnesses, Theresa Coleman, a day care worker at Ansley's day care center, Terri Pates, respondent's sister, and Latanya Pates, respondent's niece. It is unnecessary to relate their testimony for purposes of resolving the issues raised on appeal. In addition respondent testified on her own behalf and petitioner testified in rebuttal. That testimony has already been summarized.

At the conclusion of the hearing, the court stated that although respondent may have had a basis to seek an order of protection in the past, she did not do so. The court ruled that there had been a sufficient showing to support an order of protection, "based upon the incidents that have occurred, and albeit they occurred in respondent's home, um, I don't distinguish that from being elsewhere." The court further found that there had been interference with visitation. The court issued a plenary order of protection in favor of petitioner, but returned custody of Ansley to respondent. Petitioner was granted visitation every weekend from Friday night to Sunday night.

## Analysis

■ Respondent raises numerous issues on appeal, many of which relate to the issuance of the emergency order of protection and the March 8, 1999, hearing on the petition for rehearing. However, the record does not contain a report of proceedings for the February 26 *ex parte* hearing or the March 8 hearing, nor has respondent provided a bystander's report or an agreed statement of facts. See 166 Ill. 2d Rs. 323(c), (d). Absent a sufficiently complete record to support a claim of error, it is presumed that the trial court's order was in conformity with the law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 459 N.E.2d 958 (1984); *Chabowski v. Vacation Village Ass'n*, 291 Ill. App. 3d 525, 690 N.E.2d 115 (1997). We therefore will not consider respondent's arguments relative to these hearings except for the issue of the home study, as discussed below.

■ Respondent also raises issues concerning the March 17 hearing at which the court issued an interim order of protection, as well as issues related to the subsequent denial of respondent's motion for reconsideration. These issues are, for the most part, moot. An issue is moot when intervening events have rendered it impossible for a

reviewing court to grant the complaining party effectual relief. *Richardson v. Rock Island County Officers Electoral Board*, 179 Ill. 2d 252, 688 N.E.2d 633 (1997). Here, the interim order has expired and has been replaced by the plenary order of protection. We can afford no relief from the interim order or the denial of the motion for reconsideration.

However, moot issues may be reviewed under the public interest exception to the mootness doctrine if there is a substantial public or private question involved, an authoritative determination is needed for future guidance, and the issue is likely to recur. *Richardson*, 179 Ill. 2d 252, 688 N.E.2d 633; *Whitten v. Whitten*, 292 Ill. App. 3d 780, 686 N.E.2d 19 (1997). In *Whitten* this court noted that the Domestic Violence Act addresses problems of public interest and that the purposes of the Act can only be achieved if courts properly apply its requirements. Because we deem it likely that the issue of ordering home studies in domestic violence cases is likely to recur, we will consider whether such an order is authorized under the Act.

■ Statutory authority for ordering a home study can be found in section 605 of the Marriage Act, which provides in part:

> "§ 605. Investigations and Reports. (a) *In contested custody proceedings*, and in other custody proceedings if a parent or the child's custodian so requests, the court may order an investigation and report concerning custodial arrangements for the child. The investigation and report may be made by a child welfare agency approved by the Department of Children and Family Services, but shall not be made by that Department unless the court determines either that there is no child welfare agency available or that the parent or the child's custodian is financially unable to pay for the investigation or report." (Emphasis added.) 750 ILCS 5/605(a) (West 1998).

■ Of course, proceedings under the Domestic Violence Act for protective orders are not, strictly speaking, "contested custody proceedings." The primary purposes of the Act are to aid the victims of domestic violence and prevent further abuse. See generally 750 ILCS 60/102 (West 1998). Nevertheless, one of the remedies available to a petitioner seeking an order of protection is temporary legal custody. See 750 ILCS 60/214(b)(6) (West 1998). An award of custody under section 214 is to be made "in accordance with" the Marriage Act. 750 ILCS 60/214(b)(6) (West 1998). Therefore, because temporary custody may be awarded under the Domestic Violence Act, and because the Act makes specific reference to the Marriage Act, we believe that a court in a domestic violence case could order a home study pursuant to section 605 of the Marriage Act. We further believe, however, that

such a study should only be ordered in exceptional cases because of the substantial possibility of causing delay. An action for an order of protection is an expedited proceeding (see 750 ILCS 60/212, 213 (West 1998)) which should not be prolonged unless clearly necessary.

◼ In addition, as respondent points out, an *emergency* order of protection *may not* include an award of legal custody. 750 ILCS 60/217(a)(3)(iii) (West 1998). Therefore, while the court could order a home study to be used in ruling on an interim or plenary order, it should not have continued the March 8 hearing to await the report. Respondent had a right to a prompt rehearing concerning the emergency order of protection. Any unnecessary delay—for a home study or for some other reason—thwarts the purpose of section 224(d) and may result in a denial of due process. Moreover, the record supports the claim of respondent's attorney that she was unfairly blamed at the March 17 hearing for the delay in arranging the home study. This resulted in additional delay. We remind the trial court that, in a case where an infant not yet six weeks old is removed from the care of his mother, every effort should be made to resolve the merits of the case as quickly as possible.

We next consider respondent's arguments that petitioner misused the Domestic Violence Act as a means to obtain possession and custody of Ansley. In *In re Marriage of Gordon*, 233 Ill. App. 3d 617, 599 N.E.2d 1151 (1992), the court sharply criticized use of the Domestic Violence Act as a subterfuge to gain custody:

"Robert has not advanced any reason, nor can we find one, to justify his proceeding under the Domestic Violence Act rather than the Marriage Act. Whatever the relief he sought—extended visitation, injunction or custody—he could have received it under section 610 of the Marriage Act. To approve the procedure followed in this case would be an open invitation to parties disappointed in a custody dispute to file a separate action under the Domestic Violence Act and call it something other than a claim for custody." *Gordon*, 233 Ill. App. 3d at 648, 599 N.E.2d at 1172.

◼ ◼ In this case petitioner could have filed a petition for visitation or custody under the Parentage Act (see 750 ILCS 45/6(e) (West 1998)) or the Marriage Act (see 750 ILCS 5/601(b)(1)(ii) (West 1998)). Instead, petitioner waited until he had physical custody of the child and then sought an *ex parte* order of protection. A careful review of the entire record convinces this court that petitioner's primary purpose in seeking an order of protection was not to prevent abuse but was to obtain visitation with and custody of the child. While petitioner's desire to be a part of his child's life is laudable, obtaining an order of protection is not the proper procedure for establishing

visitation. Petitioner's misuse of the Domestic Violence Act in this manner warrants reversal of the plenary order of protection entered in this case. Cf. *Gordon*, 233 Ill. App. 3d at 648, 599 N.E.2d at 1172 ("We would be justified in reversing the judgment on the grounds that the judge exceeded his statutory authority and that the Domestic Violence Act was misused ***"). We emphasize that not every case of improper use of the Act would require reversal. It is both the misuse of the Act and the dearth of evidence of abuse, as explained below, that compel reversal.

Respondent asserts that the trial court's finding that petitioner was abused was against the manifest weight of the evidence. Although there is some support for applying a manifest weight standard (see *Gordon*, 233 Ill. App. 3d 617, 599 N.E.2d 1151), most appellate courts have reviewed findings of abuse under an abuse of discretion standard. See *Shields v. Fry*, 301 Ill. App. 3d 570, 703 N.E.2d 921 (1998); *Whitten*, 292 Ill. App. 3d 780, 686 N.E.2d 19; *In re Marriage of Lichtenstein*, 263 Ill. App. 3d 266, 637 N.E.2d 1258 (1994); *In re Marriage of Blitstein*, 212 Ill. App. 3d 124, 569 N.E.2d 1357 (1991). A court abuses its discretion when it acts arbitrarily without the use of conscientious judgment or exceeds the bounds of reason and ignores established principles of law such that substantial injustice results. *In re Estate of Marks*, 231 Ill. App. 3d 313, 595 N.E.2d 717 (1992). An abuse of discretion occurs when no reasonable person would take the view adopted by the court. See *Whitten*, 292 Ill. App. 3d 780, 686 N.E.2d 19; *Marks*, 231 Ill. App. 3d 313, 595 N.E.2d 717.

It appears from the court's comments at the April 30, 1999, hearing that the court based its finding of abuse on the December 9, 1998, and February 16, 1999, incidents at respondent's home, and on interference by respondent with petitioner's visitation with Ansley. This latter finding was an abuse of discretion. Section 214(c)(5) of the Domestic Violence Act states that no rights or responsibilities for a child born outside of marriage attach to a putative father until a father and child relationship has been legally established. 750 ILCS 60/214(c)(5) (West 1998). One manner of establishing that relationship is by signing a voluntary acknowledgment of paternity, which petitioner did in this case. See 750 ILCS 45/6(a) (West 1998). While such an acknowledgment has the full force and effect of a judgment of paternity (750 ILCS 45/6(b) (West 1998)), it does not itself establish visitation rights. Instead, establishing paternity is a *precondition* to gaining visitation, custody, or physical care and possession of the child. See 750 ILCS 60/214(c)(5) (West 1998) (absent establishment of father-child relationship, putative father may not be granted custody, visitation or physical care and possession of child). If petitioner was unhappy

with the visitation voluntarily granted to him by respondent, the proper procedure was to file a petition for visitation or custody under the Parentage Act (see 750 ILCS 45/6(e) (West 1998)) or the Marriage Act (see 750 ILCS 5/601 *et seq.* (West 1998); see also *Department of Public Aid ex rel. Gagnon-Dix v. Gagnon*, 288 Ill. App. 3d 424, 680 N.E.2d 509 (1997) (order establishing paternity does not automatically entitle father to visitation)). We repeat that the primary purpose of the Domestic Violence Act is to aid victims of domestic violence and prevent further abuse, not resolve issues of visitation and custody.

We also find that the trial court abused its discretion in ruling that the February 16, 1999, incident constituted abuse. Abuse as defined under the Act includes physical abuse and harassment. 750 ILCS 60/103(1) (West 1998). Physical abuse includes knowing or reckless conduct which creates an immediate risk of physical harm. 750 ILCS 60/103(14)(iii) (West 1998). Harassment means "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." 750 ILCS 60/103(7) (West 1998).

Even assuming that the trial court resolved all questions of credibility in favor of petitioner, respondent's conduct on February 16 did not constitute physical abuse. According to petitioner, after respondent refused his offer of $40 for the baby pictures, she became "angry, upset and loud" and she screamed at him and told him to leave. When petitioner did not leave, respondent "grabbed Ansley" and "jerked" him from petitioner's hands. There is no indication that respondent's actions created an immediate risk of physical harm to the child. While she may have acted abruptly, taking the child from petitioner did not constitute physical abuse. Nor does the fact that respondent may have become angry and "screamed" at petitioner constitute harassment. We do not believe that the Domestic Violence Act was intended to exaggerate every petty argument into a basis for an order of protection.

We agree, however, that respondent's actions on December 9, 1998, fell within the Act's definition of physical abuse: "knowing or reckless use of physical force, confinement or restraint" (750 ILCS 60/103(14)(i) (West 1998)). On that day, again assuming that the trial court believed petitioner rather than respondent, petitioner came uninvited to respondent's home to make arrangements to be at the hospital when the baby was born. Respondent became upset and repeatedly told petitioner to leave, but he refused. Respondent, at the time approximately eight months pregnant, then tried to shove petitioner out of her home, and hit him in the face, chest and shoulders. It was

certainly within the trial court's discretion to find that this conduct constituted abuse. However, while respondent's actions may have technically been abusive, they were to a certain degree understandable, if not entirely justified. Section 214(e) of the Act provides that remedies available under the Act should not be denied on the basis that a respondent had cause to use force unless that cause satisfies the standards of justifiable use of force under the Criminal Code of 1961 (Criminal Code or the Code) (720 ILCS 5/7—1 *et seq.* (West 1998)). 750 ILCS 60/214(e) (West 1998). Section 7—2 of the Criminal Code allows a person to use force to terminate an unlawful entry into a dwelling. 720 ILCS 5/7—2 (West 1998). Section 21—3 of the Code provides that a person who remains on another's property after receiving notice from the owner to depart commits criminal trespass. 720 ILCS 5/21—3 (West 1998). Arguably then, once petitioner was told to leave and he refused, respondent could use reasonable force to eject him. We need not resolve that question, however, because even if respondent's actions constituted abuse, they were insufficient to warrant an order of protection in light of petitioner's misuse of the Domestic Violence Act as described above. Accordingly, we reverse the order of the trial court granting a plenary order of protection in favor of the petitioner.

For the reasons stated above, the judgment of the circuit court is reversed and the plenary order of protection is vacated.

Reversed; order vacated.

KOEHLER and LYTTON, JJ., concur.