NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190248-U

NO. 4-19-0248

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 3, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CHERYL STINAUER, | ) | Appeal from |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Mason County |
| MOLLY STINAUER, | ) | No. 19OP15 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Thomson, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HOLDER WHITE delivered the judgment of the court. Justices Steigmann and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, concluding (1) the trial court sufficiently complied with the requirements of the Domestic Violence Act, (2) petitioner did not misuse the Domestic Violence Act to gain custody of or visitation with the children, and (3) the court's finding that petitioner was abused was not against the manifest weight of the evidence.

¶ 2    In February 2019, petitioner, Cheryl Stinauer, filed a petition for an emergency order of protection against respondent, Molly Stinauer. The petition arose from an incident that occurred after church services on February 24, 2019, where Cheryl alleged Molly, her former daughter-in-law, verbally abused her and attempted to run her over with a vehicle. The trial court entered an emergency order of protection and, in March 2019, a plenary order of protection.

¶ 3    Respondent appeals, arguing (1) the trial court failed to sufficiently set forth the minimum factual findings as required by section 214 of the Illinois Domestic Violence Act of

1986 (Domestic Violence Act) (750 ILCS 60/214(c) (West 2018)); (2) petitioner misused the Domestic Violence Act as a means to interfere with an ongoing custody dispute between respondent and petitioner's son, Jesse Stinauer; and (3) the trial court abused its discretion in finding petitioner was abused. For the following reasons, we affirm the trial court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        On February 28, 2019, petitioner filed a petition for an emergency order of protection. At the *ex parte* hearing for an emergency order of protection, the trial court asked petitioner about the allegations in her petition, including the February 24, 2019, incident. The court found petitioner was a protected person under the Domestic Violence Act and respondent's alleged conduct constituted harassment, which was conduct not necessary to accomplish a purpose that was reasonable, would cause a reasonable person emotional distress, and did cause emotional distress. The court further found that, without intervention, the abuse may continue and the harm the court tried to prevent would likely occur. The trial court entered an emergency order of protection and set a hearing for a plenary order of protection. On March 5, 2019, respondent filed an emergency motion to rehear the emergency order of protection.

¶ 6                                    A. Bench Trial

¶ 7        At the March 13, 2019, hearing, the parties agreed to (1) grant respondent's emergency motion to rehear the emergency order of protection and (2) consolidate the emergency order of protection rehearing and the hearing for the plenary order of protection, as the same evidence would be presented at each hearing. The trial court heard the following evidence.

¶ 8                                    1. *Petitioner's Witnesses*

¶ 9                                    a. Robert Stinauer

- 2 -

¶ 10    Robert Stinauer testified that on February 24, 2019, he and petitioner attended church services at St. Patrick's Catholic church in Havana, Illinois. According to Robert, he and his wife were the last to arrive at church that morning and sat across the aisle from respondent, his former daughter-in-law, and his two granddaughters. During the service, Robert made eye contact with his granddaughter O.S. and respondent "flipped Robert off". As the last song played, respondent grabbed the girls and their coats and hurried to the back of the church. Robert and petitioner went to the back door to leave and O.S. ran up to petitioner for a hug. According to Robert, respondent came up, grabbed O.S., and pulled her away from petitioner. Robert testified, "[Respondent] said [']not on my parenting time['] and she calls Cheryl a witch. She says [']you're a witch and you have a turkey neck.['] Referring to Cheryl's scars on her neck." Petitioner began crying and respondent took the girls out to the car.

¶ 11    Robert followed respondent and the grandchildren up the stairs to the parking lot and asked O.S. how a recent skiing trip with their father, Jesse Stinauer, had gone. Respondent stated Jesse failed to put helmets on the children, so she reported him to the Department of Children and Family Services (DCFS). Respondent told the children to ignore Robert because he was not their "real" grandfather. Robert testified he adopted Jesse as a child. According to Robert, O.S. was punching and kicking respondent and saying, "that's not true mom." Robert testified, "Then [E.S.] comes in, [']yeah mom, yeah mom, yeah mom.['] The two girls are both sitting next to [respondent] and then [respondent] said to me *** [']well you're going to jail.['] And then she said, [']and by the way you and [petitioner] won't be able to pick up the kids from school anymore.['] "

¶ 12    According to Robert, he waited by his vehicle for petitioner. Robert testified a snow drift prevented him from pulling his vehicle all the way into the parking space, so the rear

end of his vehicle was sticking "way into the main channel" of the parking lot. Instead of exiting the parking lot, respondent drove her vehicle approximately two feet from Robert's bumper, causing him to step back to get out of her way. Robert testified respondent circled the parking lot and pulled into a space approximately 40 feet from his vehicle.

¶ 13     Robert waited 10 minutes for petitioner, who exited the church with Ron Siever. Robert testified he could hear respondent revving her engine. Petitioner walked behind Robert's vehicle where Robert could not see her. Robert heard respondent laying on the horn and then she drove very close to his vehicle and almost clipped Siever's vehicle. According to Robert, respondent was traveling at a high rate of speed in a small parking lot. After the incident, petitioner told Robert she felt sick to her stomach for two days. Robert waited two days to contact police about the incident to allow petitioner "to settle down and *** take on something else."

¶ 14     Robert acknowledged Jesse and respondent went through a bitter divorce in 2017 and their relationship had not improved. Robert denied that he or petitioner made negative comments about respondent to other members of the church. Robert agreed that respondent was court-ordered to bring the children to St. Patrick's for religious education.

¶ 15                         b. Ronald Siever

¶ 16     Ronald Siever testified he had known petitioner since she was 15 years old. On February 24, 2019, Siever attended mass at St. Patrick's Catholic church and noticed respondent leave the service a little early with her children. After mass, Siever walked to the parking lot with petitioner and got into his truck. Siever observed respondent circle the parking lot a little bit faster than normal traffic in the parking lot. According to Siever, respondent "beeped" her

horn before she drove by. Siever did not see the subsequent incident involving petitioner and respondent.

¶ 17                                    c. Jesse Stinauer

¶ 18        Jesse Stinauer testified respondent was his ex-wife and petitioner was his mother. On February 24, 2019, Jesse arranged to meet respondent at 1 p.m. so he could take O.S. and E.S. to work on a school project. Respondent arrived approximately 30 minutes late and appeared agitated. O.S. got out of respondent's vehicle and got into Jesse's truck. According to Jesse, E.S. remained in respondent's vehicle and was upset and screaming. Jesse testified, "[E.S.] stuck her head towards the passenger door of the vehicle and says [']she tried to run over Grandma Cheryl and Papa Bob.['] " Jesse felt the need to record the interaction when respondent arrived late and appeared agitated.

¶ 19        Jesse admitted he and respondent went through a contentious divorce and did not interact well. On March 4, 2019, Jesse filed for an order of protection against respondent that included allegations regarding the February 24, 2019, incident between petitioner and respondent. Jesse agreed there was a great deal of animosity between petitioner and respondent and acknowledged he received text messages from petitioner stating respondent was "a worthless piece of shit" and she hoped respondent died. Petitioner also told Jesse the priest from St. Patrick's thought respondent was filled with demons.

¶ 20                                    d. Petitioner

¶ 21        On February 24, 2019, petitioner attended mass at St. Patrick's Catholic church and saw O.S. and E.S. sitting with respondent. Petitioner stated respondent sat closest to the aisle to block petitioner's view of her grandchildren. After the service, petitioner went to replace books in a stand and saw O.S. Petitioner gave O.S. a hug and a kiss when respondent appeared

and told O.S. to stay away from petitioner because she was a witch. According to petitioner, respondent said petitioner was a witch, was fat, and had a turkey neck. Petitioner found these comments hurtful but did not respond.

¶ 22 After the interaction, petitioner signed up for a book mentioned during the service before she went to the church parking lot. Petitioner estimated Robert went to the parking lot approximately 5 or 10 minutes earlier. When petitioner reached the parking lot, she noticed respondent's vehicle. Petitioner testified, "And I'm thinking why is her van there. I don't, I didn't make eye contact, I didn't look at her, I didn't make a gesture, I turned and walked to my car." According to petitioner, respondent was revving the engine of her vehicle to get petitioner's attention. Petitioner testified she heard rocks flying and respondent's horn. Respondent pulled around and drove too fast for the parking lot to scare petitioner. Petitioner was shaking and felt sick to her stomach. Petitioner testified she and Robert attended church in a different city to avoid contact with respondent but attended the February 24, 2019, service at St. Patrick's because they were out of town the day before.

¶ 23 Petitioner stated, "I don't have anything, any feelings toward [respondent] whatsoever other than she prevents me from seeing my grandchildren." Although Jesse and respondent shared equal time with the children, respondent would not allow the children to spend the night at petitioner's house. Petitioner testified that respondent had driven by her home, work, and gym repeatedly, but she identified only February 24, 2019, as the date on which an incident occurred. Petitioner was not looking at respondent during the incident on February 24, 2019, so she did not know how close respondent's vehicle came.

¶ 24 Petitioner testified she ordered books on Amazon about a subject respondent "probably didn't like." Petitioner stated respondent had the family password and probably

canceled petitioner's order. According to petitioner, respondent was angry and vindictive and tried to scare petitioner during the February 24, 2019, incident.

¶ 25                                  2. *Respondent's Witnesses*

¶ 26                                  a. Austin Matheny

¶ 27        Respondent called Austin Matheny, a Havana police officer, who testified that on February 26, 2019, at approximately 3:30 p.m. he received a telephone call on his personal cellular telephone from Robert Stinauer. According to Matheny, Robert called the Havana Police Department at approximately 3:10 p.m. and spoke to the police chief. Later that evening, Matheny arrived at the Stinauer house to speak with Robert and petitioner. Matheny testified he spoke to the Stinauers about an incident that occurred between petitioner and respondent. During his investigation into the incident, Matheny spoke to Ron, a member of the church, and Elizabeth, the church secretary. Matheny stated, "There were several eyewitnesses that observed several parts of it but not the entire incident." According to Matheny, no witness was able to tell Matheny the exact distance between petitioner and respondent's car. Matheny testified he was informed of the incident two days after it occurred, so he was unable to investigate how cars were parked in the parking lot or how busy the parking lot was. No injuries resulted from the incident.

¶ 28                                  b. Respondent

¶ 29        Respondent testified that on February 24, 2019, she began to leave the church parking lot but remained because E.S. was throwing a fit. According to respondent, E.S. had sensory processing disorder and often threw fits. Respondent testified her daughters had been with her for approximately one week prior to the February 2019 incident and had gotten into a routine. E.S. knew she was going back to her father on the day in question and did not transition

well. E.S. stated she did not want to attend church that morning, but respondent took her daughters to church because it was part of the parenting plan. Respondent and her daughters left mass early because E.S. needed to use the bathroom.

¶ 30       While they were in a bathroom near the rear exit, E.S. began to have a temper tantrum. According to respondent, O.S. left the bathroom first and ran into petitioner. E.S. started up the stairs and petitioner turned O.S. away and started to move in the opposite direction. Respondent testified that she did not yell but abruptly stated, "No not on my parenting time." Petitioner responded by asking what respondent was going to do. Respondent stated she would call the police and turned O.S. toward the stairs where E.S. continued to throw a fit. Respondent denied calling petitioner a witch, commenting on a turkey neck, and telling the children Robert was not their real grandfather.

¶ 31       Respondent took the children to her car and buckled their seatbelts. Respondent pulled her car out of her parking space and proceeded to circle the parking lot toward the exit. As respondent circled, E.S. unbuckled her seat belt and got out of her car seat. Respondent testified she pulled back into the same parking spot and talked E.S. through her fit. Respondent assured E.S. she would have a fine afternoon with her father and spent five to seven minutes calming E.S. down.

¶ 32       According to respondent, she again buckled E.S. into her car seat and pulled out of her parking space. Respondent testified her speed in the parking lot was not unusual and she did not think she was going too fast. When asked if she revved her engine while in the parking lot, respondent replied, "I was not but that's how I accelerate in my vehicle because it's got some issues." According to respondent, when she accelerated her vehicle it shook and went "bump, bump, bump." Respondent acknowledged the parking lot was small but testified she did not

drive any closer to petitioner than she would have any other person standing in the lot. Respondent did not recall if she honked her horn but testified she might have hit the horn while dealing with E.S. Respondent thought the children were coached to say she tried to run over petitioner.

¶ 33     Respondent testified she did not stalk petitioner at her home. According to respondent, her parents lived two blocks away from petitioner and passing by petitioner's house was unavoidable. Respondent denied hacking into petitioner's Amazon account to cancel or place orders.

¶ 34                          c. Vanessa Bergman

¶ 35     Respondent's mother, Vanessa Bergman, testified she watched the children the day after the parking lot incident. According to Bergman, E.S. never mentioned the incident or made any comment about respondent attempting to run over petitioner. Bergman testified she had seen E.S. melt down, but she had a good day when Bergman watched her after the parking lot incident.

¶ 36     Bergman stated respondent never called petitioner or Jesse names in front of the children and she never threatened to keep the children away from anyone. Bergman testified respondent did not stalk petitioner and petitioner lived on a busy road used to enter and exit the town. According to Bergman, she had never seen respondent flip someone off and did not see her flip anyone off in church on February 24, 2019. Bergman saw respondent take the children to the bathroom and herd the children out to the car. Bergman denied hearing respondent call petitioner names.

¶ 37                          B. Trial Court's Ruling

¶ 38    Following closing arguments, the trial court made no oral findings and took the matter under advisement. On March 18, 2019, the trial court entered a written order that, in part, concluded petitioner qualified as an abused person "due to the [r]espondent's harassment of the [p]etitioner by conduct which was not necessary to accomplish a purpose that was reasonable under the circumstance, which would cause a reasonable person emotional distress, and which caused emotional distress to the [p]etitioner." The court found three such instances, all of which occurred on February 24, 2019, including: (1) respondent called petitioner names and made derogatory comments in the presence of the children, (2) respondent pulled O.S. away from petitioner in a manner that upset the child, and (3) respondent drove her vehicle through the tight traffic lanes of the church parking lot at a much faster speed than normal traffic and honked her horn as she passed petitioner in such a manner that E.S. told Jesse respondent tried to run over petitioner. The order further noted respondent proved petitioner had deep feelings of animosity toward respondent as shown in derogatory text messages. However, the court noted these text messages were not directed toward respondent and were relevant only to showing petitioner's bias against respondent. The court ordered respondent to stay 50 feet away from petitioner and prohibited respondent from entering or remaining while petitioner was present at her home or place of employment.

¶ 39    This appeal followed.

¶ 40                    II. ANALYSIS

¶ 41    On appeal, respondent argues (1) the trial court failed to sufficiently set forth the minimum factual findings as required by section 214 of the Domestic Violence Act (750 ILCS 60/214(c) (West 2018)); (2) petitioner misused the Domestic Violence Act as a means to

interfere with an ongoing custody dispute between respondent and petitioner's son, Jesse Stinauer; and (3) the trial court abused its discretion in finding petitioner was abused.

¶ 42                                B. Trial Court's Factual Findings

¶ 43         Respondent first argues the trial court failed to sufficiently set forth the minimum factual findings as required by section 214(c) of the Domestic Violence Act. Specifically, respondent argues the court failed to indicate that (1) it considered the relevant factors, (2) respondent's alleged conduct would likely cause irreparable harm or continued abuse, and (3) it was necessary to grant the requested relief to protect petitioner. Petitioner asserts the court's findings made during the *ex parte* hearing for an emergency order of protection were implicitly incorporated into the plenary order of protection and sufficiently comply with the requirements of the Domestic Violence Act. Alternatively, if this court concludes the trial court failed to sufficiently comply with the Domestic Violence Act, petitioner argues the matter should be remanded for the trial court to make the required findings.

¶ 44         Section 214 of the Domestic Violence Act requires a trial court, in determining whether to grant a specific remedy, to consider relevant factors that include, but are not limited to, the following: "the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member, including the concealment of his or her location in order to evade service of process or notice, and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household." 750 ILCS 60/214(c)(1)(i) (West 2018). The Domestic Violence Act further provides:

            "(3) Subject to the exceptions set forth in paragraph (4) of

            this subsection, the court shall make its findings in an official

- 11 -

record or in writing, and shall at a minimum set forth the following:

    (i) That the court has considered the applicable relevant factors described in paragraphs (1) and (2) of this subsection.

    (ii) Whether the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse.

    (iii) Whether it is necessary to grant the requested relief in order to protect petitioner or other alleged abused persons." 750 ILCS 60/214(c)(3) (West 2018).

¶ 45    In this case, the trial court's written order makes no mention of the factors in section 214(c), whether respondent's conduct would likely cause irreparable harm or continued abuse, or whether it was necessary to grant the requested relief to protect petitioner. Although the order did not specifically enumerate the factors found in section 214(c), the court found petitioner to be an abused person protected by the Domestic Violence Act and it addressed the nature, severity, and consequences of the harassment as evidenced by its findings that respondent's conduct upset the children and caused E.S. to tell Jesse respondent tried to run over petitioner. Moreover, the trial court made findings, both in writing and orally, in granting the *ex parte* order of protection that, without intervention, the abuse would continue and the harm the court tried to prevent would likely occur. Additionally, at the end of the hearing for the plenary order of protection, the court noted the emergency order expired on March 20, 2019, and it stated it would issue its decision filed prior to that date. The court filed the plenary order of protection on March 18, 2019. The court clearly intended to continue the emergency order as a plenary order of protection. As such, the necessary findings were effectively incorporated into

- 12 -

the plenary order. See *Mowen v. Holland*, 336 Ill. App. 3d 368, 376, 783 N.E.2d 180, 186 (2003) ("When the trial court issued its 'Order Following Issuance of Emergency Order of Protection' continuing the emergency order in full force and effect as a plenary order of protection, the relevant findings of the emergency order were effectively incorporated by reference into the plenary order.").

¶ 46        Our review of the record shows the trial court considered the relevant factors, found respondent's conduct would cause irreparable harm or continued abuse, and found the stay-away order necessary to protect petitioner. Although the court failed to use the verbatim language from section 214(c)(3) in its written plenary order, the record shows the court considered the relevant factors and made the required findings.

¶ 47                    B. Petitioner's Use of the Domestic Violence Act

¶ 48        Respondent next argues petitioner misused the Domestic Violence Act in an attempt to usurp a custody ruling in respondent and Jesse's divorce case and to gain grandparent visitation rights.

¶ 49        "The primary purpose of the Domestic Violence Act is to aid victims of domestic violence and to prevent further violence." *Radke ex rel. Radke v. Radke*, 349 Ill. App. 3d 264, 268, 812 N.E.2d 9, 13 (2004). An order of protection is not a means to resolve child custody or visitation issues. *Id.* at 269. The misuse of the Domestic Violence Act to obtain custody of or visitation with a child, coupled with a dearth of evidence of abuse or harassment, warrants reversal of a plenary order of protection. *Wilson v. Jackson*, 312 Ill. App. 3d 1156, 1164-65, 728 N.E.2d 832, 839 (2000).

¶ 50        Respondent asserts petitioner misused the Domestic Violence Act to obtain grandparent visitation and to subvert a custody ruling in her divorce case. The parties both

devote a great deal of discussion to Jesse's own petition for an order of protection and various proceedings in respondent's and Jesse's divorce case. However, none of these documents are in the record on appeal so we decline to address the portions of respondent's argument that rely on matters outside of the record. Respondent argues that petitioner included allegations in her petition for an order of protection that indicate her misuse of the Domestic Violence Act. Specifically, respondent points to the following allegations:

"Continuous verbal threats about keeping the girls away

from me.

\*\*\*

Refused to drop the girls off for exchanges during Jesse's

parenting time and interfering when I am picking them up from

their activities.

\*\*\*

[Respondent] kept the girls from me over the Christmas

break and did not allow me to spend several days with them stating

that since she and Jesse did not agree on the division of their time

off school, she decided on her own that she was to keep them."

¶ 51    Respondent ignores the other allegations in the petition for an order of protection that include, in part, the February 24, 2019, incident, as well as allegations that respondent obsessively drove by petitioner's home, workplace, and gym, made threats to petitioner, and verbally abused petitioner. Moreover, petitioner made no request for a change in custody or for visitation with her grandchildren. The petition sought to (1) prohibit respondent from harassing petitioner, (2) require respondent to stay at least 500 feet away from petitioner, and (3) prohibit

- 14 -

respondent from entering or remaining while petitioner was present at petitioner's home, place of employment, gym, and church. The only other remedy sought in the petition for an order of protection was counseling for respondent.

¶ 52        Respondent relies on *Wilson*, 312 Ill. App. 3d 1156, to support her argument. In *Wilson*, the respondent challenged the petitioner's use of the Domestic Violence Act where the petitioner waited until he had physical custody of the parties' minor child before he filed for an emergency order of protection placing the child in his care. *Id.* at 1159. The reviewing court concluded the petitioner could have filed a petition for visitation or custody but instead waited until he had custody of the child and then sought an *ex parte* order of protection. *Id.* at 1164. After reviewing the record, the appellate court concluded the "petitioner's primary purpose in seeking an order of protection was not to prevent abuse but was to obtain visitation with and custody of the child." *Id.*

¶ 53        Unlike in *Wilson*, petitioner's petition for an order of protection did not seek either visitation with or custody of the children. The petition merely sought to prevent respondent from harassing petitioner. Although the petition does make numerous references to the children, this is unsurprising given the fact that the only reason for petitioner and respondent to interact involved the children. Nothing in the record indicates petitioner sought to usurp a custody or visitation order in respondent's and Jesse's divorce case and the plenary order of protection made no change in custody of the children or required visitation for petitioner. Accordingly, we conclude petitioner did not misuse the Domestic Violence Act.

¶ 54                                C. Finding of Abuse

¶ 55          Finally, respondent argues the trial court's finding that petitioner was abused was an abuse of discretion.  Petitioner argues the trial court's finding was not against the manifest weight of the evidence.

¶ 56          The central inquiry in a proceeding to obtain an order of protection is whether the petitioner has been abused.  *Best v. Best*, 223 Ill. 2d 342, 348, 860 N.E.2d 240, 244 (2006).  Abuse includes harassment, which is defined as "conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner."  750 ICS 60/103(7) (West 2018).  "Any proceeding to obtain, modify, reopen[,] or appeal an order of protection *** shall be governed by the rules of civil procedure of this State.  The standard of proof in such a proceeding is proof by a preponderance of the evidence ***."  750 ILCS 60/205(a) (West 2018).  This court will reverse a trial court's finding by the preponderance of the evidence only if it is against the manifest weight of the evidence.  *Best*, 223 Ill. 2d at 348-49.

¶ 57          "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented."  *Id.* at 350.  Under this standard of review, we give deference to the trial court because it is in the best position to observe the demeanor and conduct of the parties and the witnesses.  *Id.*  We will not substitute our judgment for that of the finder of fact regarding witness credibility, the weight given to the evidence, or the inferences drawn from the evidence.  *Id.* at 350-51.

¶ 58          Here, the trial court clearly credited petitioner's account of the February 24, 2019, incident, including her testimony that respondent used abusive language, pulled O.S. away from petitioner, revved her car engine in an attempt to frighten petitioner, and drove at a high rate of

speed in a tight parking lot at close proximity to petitioner. The court credited petitioner's testimony that respondent drove by her place of employment and her gym, as evidenced by the requirement that respondent stay away from those places when petitioner was present. The court found respondent's innocent explanations for the February 24, 2019, incident to be incredible. We will not substitute our judgment for that of the trial court because it was in the better position to observe the witnesses and make credibility determinations.

¶ 59    The trial court's findings of fact were based on the evidence presented and were not arbitrary or unreasonable. Although the court focused on the February 24, 2019, incident, the evidence showed respondent's conduct was not limited to that single incident. Petitioner testified respondent regularly used abusive language and made threats to petitioner. Respondent makes much of the fact that petitioner did not see how close respondent's car came to her. Respondent argues merely driving fast in a tight parking lot is insufficient to find respondent's conduct constituted harassment and warranted a plenary order of protection. Although the abusive language may only show a petty argument, respondent's actions in the church parking lot show an escalation of the incident. Honking one's horn and quickly accelerating toward a person in a small parking lot is an aggressive action. Although respondent did not actually hit petitioner with her vehicle, we do not think vehicular assault is in fact necessary to warrant an order of protection. Indeed, respondent's actions seemed intended to scare petitioner, rather than injure her. The Domestic Violence Act offers protection against such conduct by allowing a petitioner to seek an order of protection based on harassment.

¶ 60    Respondent further argues the trial court erred by basing its decision on respondent pulling O.S. away from petitioner. Respondent argues her testimony that petitioner pulled O.S. in the opposite direction warrants the opposite conclusion and would support an

- 17 -

order of protection against petitioner. However, the trial court heard both accounts of the incident and credited petitioner's testimony that respondent pulled O.S. away and caused O.S. to become upset. Additionally, the court highlighted this aspect of the incident because the effect respondent's conduct had on the child showed the nature and severity of respondent's behavior. The court did not err in relying on this evidence in making its determination that petitioner was an abused person under the Domestic Violence Act.

¶ 61　　　　　As discussed above, we conclude the trial court adequately complied with the required findings, the petitioner did not misuse the Domestic Violence Act to gain custody or visitation with the children, and the court's finding that petitioner was an abused person was not against the manifest weight of the evidence. Accordingly, we affirm the judgment of the trial court.

¶ 62　　　　　　　　　　　　III. CONCLUSION

¶ 63　　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 64　　　　　Affirmed.