*In re* C.C. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Connie C. *et al.*, Respondents-Appellants).

First District (5th Division)    Nos. 1—87—3128, 1—88—2698 cons.

Opinion filed December 27, 1991.—Rehearing denied February 14, 1992, and May 4, 1992.

Rita Fry, Public Defender, of Chicago (Millicent Willis, Assistant Public Defender, of counsel), for appellant Connie C.

David A. Izzo, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellant Robert C.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kathleen F. Howlett, and Anne C. Scrivner, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Kim Albert, of counsel), guardian *ad litem*.

JUSTICE McNULTY delivered the opinion of the court:

This is an appeal from an order in a juvenile proceeding involving Connie C. and Robert C., Sr., and their children C.C. and R.C. The issues presented on appeal are whether: (1) there was corroborating evidence for the out-of-court statements made by the minors accusing their father of sexual abuse; (2) the trial court's findings of abuse against the father are against the manifest weight of the evidence; (3) the trial court erred in the entry of the finding of dependency against the father; (4) the trial court erred in conducting simultaneously the supplemental petition to deny the mother supervised visits and the adjudicatory hearing alleging sexual abuse by the custodial father; (5) the trial court erred in entering a finding of unable as to the mother; (6) the trial court erred in terminating the mother's supervised visits with her children; (7) the trial court improperly admitted various

forms of hearsay evidence; (8) the trial court erred in terminating the mother's visitation rights indefinitely; (9) the trial court used the correct standard of review when it determined the mother's unfitness; and (10) the mother received ineffective assistance of counsel.

The Department of Children and Family Services (DCFS) first became involved with the C. family in 1977. In 1984, the trial court entered a finding of environment injurious against the mother, and the children were removed from her custody. In 1986, while the boys were living with their father, the State filed a petition for adjudication of wardship, alleging that C.C. and R.C. were victims of sexual abuse by their father.

During the 1985-1986 year, when he was five years old, C.C. attended the John Muir School and was enrolled in a special education program for emotionally disturbed children. A social worker in the school, Jeannette Jungst, testified that she had noticed changes and a deterioration in C.C.'s behavior after he began living with his father. According to Ms. Jungst, C.C. was more sensitive, began crying over insignificant things, began wetting his pants daily, became increasingly less affectionate and did not want adults to touch him or to place him on their laps. In addition to being tired and lethargic, C.C. was difficult to motivate and stopped doing his school work.

While in Ms. Jungst's office on March 18, 1986, C.C. asked if he could play with the puppets on Ms. Jungst's shelf. After taking three puppets off of the shelf, C.C. named one puppet after himself, one after his brother R.C., and one after his father. C.C. then said that he wanted to play a secret game which made him sad and his father happy. C.C. told Ms. Jungst that he tried to hide in a closet or under the bed when his father wanted to play the game and that while he was hiding, he could hear his father and R.C. playing the game. C.C. stated that despite his efforts to hide, he was forced to play the game. C.C. told Ms. Jungst that when he played the game, his father would hold him very tight and assure him that the game would be quick and fast. C.C. explained that the game involved turning one's head and mouth and the use of private parts. When asked to identify his private parts, C.C. pointed to his penis and rear end. C.C. then put one puppet's penis in another puppet's mouth and said that his father would do this before switching positions. According to C.C., his father and R.C. would play the same type of game before all three eventually participated. He explained that during this game, some white sticky stuff would come out and he had to spit it out and get a drink of water.

That same day, Jean Gulino, a social worker at the Behavior Education Center where C.C.'s older brother, R.C., attended school, brought R.C. over to the John Muir School for a meeting with Ms. Jungst, C.C., a DCFS social worker and C.C.'s teacher. C.C. once again used the puppets to describe the secret game that he and his brother played with their father. Ms. Gulino testified that although R.C. was seven years old, he functioned as an 18-month-old emotionally, and that he wet his pants, had bowel movements in his pants, had frequent temper tantrums, cried and whined a great deal, was unable to accept hugs, could not sit in his seat at school and was unable to complete or do any task unless an adult sat with him and supervised.

C.C. and R.C. were then placed in Mt. Sinai Hospital, where they stayed from March 20 to March 28, 1986. Dr. Sharon Ahart testified that although she did not conduct the initial physical examination of the boys, she did conduct the follow-up examination and managed their cases. Dr. Ahart testified that both C.C. and R.C. underwent complete physical examinations, laboratory tests for sexually transmitted diseases and sexual trauma as well as a variety of interviews and tests by a social worker, a psychologist, a psychiatrist and a child-life specialist. The diagnosis on C.C. was both sexual abuse and physical abuse while the discharge diagnosis on R.C. was sexual abuse, mild retardation and severe developmental delay. Dr. Ahart noted that since child abuse cannot always be diagnosed by physical determinations, the diagnoses were the result of a team decision in which an interdisciplinary group made up of a child-life specialist, a psychologist, a social worker, a psychiatrist, and nurses compiled a "composite picture" of the boys. She testified that while the physical examinations of the boys did not reveal the presence of sexually transmitted diseases or physical evidence of sexual abuse, the team concluded from their interviews, evaluations and observations of the boys that they were both victims of sexual abuse. This conclusion was reached in part by C.C.'s discussions about touching his penis, about touching his father's penis both erect and then soft again and about "yellow stuff." The team also found significant the fact that there was some sexual acting out between the two boys.

After his stay in Mt. Sinai Hospital, R.C. returned to school at the Behavioral Education Center and to therapy sessions with Ms. Gulino. During one of these therapy sessions, Ms. Gulino discussed C.C.'s description of the secret game. R.C. mostly listened but did say that what C.C. had told was true. R.C. told Ms. Gulino about bad touches by his father, and when asked where his father touched him,

R.C. pointed to his genitals. R.C. also told Ms. Gulino that his father hit him.

During the hearing on the State's petition for adjudication of wardship, the boys' mother tendered a petition for supplemental relief requesting supervised visits with R.C. and C.C. Objecting to the petition, the assistant public guardian asked that any supervised visits be terminated. Marjorie Morris, a DCFS social worker, testified that during the period between October 1980 and June 1983, DCFS received 10 reports of abuse involving the father and the mother. Ms. Morris testified there were seven findings of abuse against the mother and that, in June 1983, a service plan allowing the mother supervised visitation was drawn up. The mother, however, failed to comply with the plan and the last visit between the mother and the two boys occurred in June 1983. DCFS next met with the mother during an administrative case review in March 1987, where it was explained to the mother that after her disappearance from the boys' lives for four years, it would be psychologically detrimental to the children if she suddenly reappeared. DCFS, therefore, drew up a service plan for the purpose of gradually reintroducing the mother to her children. The plan required the mother to schedule a three-way telephone call between her, the private agency worker, and the boys. After the telephone call, the mother was to send each son a photograph of herself and a letter explaining who she was and where she had been. Ms. Morris testified that although the mother telephoned the boys on May 14, 1987, she failed to follow the call with either a letter or a photograph.

Lisa Cole testified that she had known R.C. since April 1986, when he was placed in her home. She testified that when R.C. was first placed, he wet his pants two or three times a day, drooled constantly, and was unable to groom himself or to follow instruction. She testified that while under her care, R.C's behavior improved significantly. However, according to Ms. Cole, after R.C. received the call from his mother on May 14, 1987, his behavior began to deteriorate. Ms. Cole also testified that despite instructing the mother not to mention either the boys' father or R.C. coming to live with her, the mother brought up both subjects during her conversation with the boys. After the telephone call, R.C. asked questions concerning what a mother was and why she had not seen him. R.C. also exhibited angry feelings, began crying, wetting his bed, acting out in school, and requiring someone to physically hold him and comfort him. Ms. Gulino, the school therapist, also testified that R.C. had been making progress until after he received the telephone call from his mother.

Karen Chaac, C.C.'s foster mother, likewise testified that after receiving the telephone call from the mother on May 14, 1986, C.C became angry and depressed. Ms. Chaac testified that although C.C. received a letter from his mother, a photograph was not enclosed. While Ms. Chaac was reading the letter to C.C., C.C. asked to go to the bathroom and once inside the bathroom began to repeatedly bang his head against the wall until he was physically restrained by Ms. Chaac. In addition, Ms. Chaac stated that after being contacted by his mother, C.C. began to engage in behavior that he had not exhibited in 10 months, such as crying, wetting his pants, having bowel movements in his pants and crying in his sleep. Rather than bringing home from school pictures he had made of "smiling faces," C.C. brought home "sad faces." In addition, C.C. would only color in black and when asked what one picture he brought home was, C.C. responded that it was a picture of him hanging himself. In addition, C.C. continually asked Ms. Chaac if she no longer wanted or loved him.

Thomas Denst, a social worker who worked with C.C. during the 1986-87 year, testified to noticeable changes and regression in C.C.'s behavior after C.C. received the telephone call from his mother. According to Mr. Denst, C.C. went from being a group leader to acting like a baby and causing disturbances. In addition to making inappropriate comments and having difficulty getting along with other children in school, C.C. would have outbursts that would end in crying spells.

Linda Vasquez, a caseworker from Central Baptist Family Services who had worked with the C. family from August 1983 to January 1985, testified that despite the mother's requests to see the boys, the mother repeatedly failed to show up for scheduled visits or to explain her failure to appear. Dr. Bonnie Benzies, a psychologist that worked with the boys, recommended termination of visits between mother and children based upon the inconsistencies in the mother's life and the traumatic effects her presence had on the boys.

The mother testified that she had sent her children letters which included a photograph of herself and telephoned them. She testified that despite her efforts to comply with the service plan, she has been denied visitation with her children. The mother testified that she wants to visit with both boys and work toward their eventual return.

After finding that the mother failed to follow through with the service plan set up by DCFS and that the mother's consistency in her dealings with her children would be in the children's best interests, the trial court denied the petition to implement supervised visits between C.C., R.C. and their mother. Having denied the petition for

supplemental relief, the hearing for the petition for adjudication of wardship based upon allegations of sexual abuse by the father resumed. The father's pastor, David C. Brown, testified that in his contact with the family over the last nine years, he had never observed the father have any contact with his sons outside the realm of normal child-parent relationships.

Officer Dubs, a patrol officer, testified that on March 18, 1986, he received a call to investigate possible child abuse at the father's address. During his half-hour interview with the father, the father denied all allegations of sexual abuse.

The trial court concluded that R.C. was abused, and that the parents created an injurious environment that created a substantial risk of physical injuries to R.C. The court further found that the parents allowed a sex offense to be committed against R.C. and made a finding of dependency as to the father. The trial court entered a finding of unable as to the mother, a finding of unable, unwilling and unfit as to the father and adjudicated wardship of C.C. and R.C. The trial court granted guardianship with the right to place to Gary T. Morgan from DCFS. Although both parents filed separate appeals, the cases have been consolidated.

OPINION

■■ Initially, the father maintains that the trial court erred when it based its finding of abuse as to the father on out-of-court statements made by the minors since the statements were not corroborated by independent evidence. While out-of-court statements are generally inadmissible hearsay, the Juvenile Court Act provides an exception for the admission of out-of-court statements made by minors that pertain to incidents of abuse or neglect. Section 2—18(4)(c) provides:

> "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." (Ill. Rev. Stat. 1987, ch. 37, par. 802—18(4)(c).)

In evaluating whether the minor's out-of-court statements were sufficiently corroborated by independent evidence, we find persuasive *In re K.L.M.* (1986), 146 Ill. App. 3d 489, 496 N.E.2d 1262. In *K.L.M.*, the court found that the child's out-of-court testimony of sexual abuse by her father was corroborated by: (1) testimony of a caseworker for DCFS and a psychotherapist that the child was anxious and that this

was a sign of abuse; (2) the father's testimony which indicated that the child had limited opportunity to have learned about the sexual matters that she allegedly described; (3) the fact that there was no opportunity to arrange for the minor to give false testimony; and (4) the fact that the child had skin irritation in the genital area. The court concluded that when taken together, this circumstantial evidence constituted sufficient corroboration of the hearsay evidence, especially in light of the facts that there was no apparent reason why the child would have fabricated her story and that she would not have been able to describe semen unless she had seen it and it would have been unlikely that she had seen it unless the events she related had actually taken place. *K.L.M.*, 146 Ill. App. 3d at 494, 496 N.E.2d at 1266.

The father claims that the instant case is distinguishable from *K.L.M.* since here the children's statements were not corroborated by physical evidence of abuse. We are not persuaded by the father's argument since what constitutes corroborative evidence varies depending upon the facts to be corroborated. (*In re Brunken* (1985), 139 Ill. App. 3d 232, 487 N.E.2d 397.) The type of sexual abuse alleged here, oral copulation, is not the type which would be supported by physical evidence of abuse.

■ Corroborating evidence is that which by its nature makes it more probable that the child was abused. (*In re Marcus E.* (1989), 183 Ill. App. 3d 693, 539 N.E.2d 344.) The children's testimony in the instant case was corroborated by the fact that approximately six months after being returned to his father's custody, C.C.'s social worker, Jeannette Jungst, observed C.C. playing with anatomically correct puppets where he recreated the secret game he played with his father and his brother R.C. Another highly probative fact was C.C.'s ability to describe semen. A five-year-old would not have been able to describe semen unless he had seen it, which is unlikely unless the events that C.C. described during the "secret game" had actually taken place. In addition to testifying about the children's statements, both Ms. Jungst and Ms. Gulino testified about unusual behaviors exhibited by C.C. and R.C., respectively, beginning in September 1985. Ms. Jungst testified that C.C. began crying over insignificant things, wetting his pants every day, became less affectionate, did not want to be touched, stopped doing school work and was hard to motivate. Ms. Gulino testified that R.C frequently wet his pants and had bowel movements in his pants, had frequent tantrums, often cried and wined, and would not let anyone hug him. Furthermore, as Dr. Ahart testified, while at Mt. Sinai Hospital, an interdisciplinary team interviewed, observed and psychologically tested both children. The team

put together a "composite picture" of the boys and concluded that both R.C. and C.C. had been sexually abused. These facts make it more probable than not that the children were indeed sexually abused by their father. While the father relies on *In re Custody of Brunken* (1985), 139 Ill. App. 3d 232, 487 N.E.2d 397, we find this case distinguishable because the allegations of abuse there arose from a visitation dispute between the parents and the mother had a motive to fabricate allegations of sexual abuse by the father. Here, there is no evidence to indicate that any of the caseworkers, teachers or doctors who testified had the motive or opportunity to arrange for the minors to give false testimony just as there is no evidence of any sort that either boy had a reason to fabricate such a story. Furthermore, in *Brunken*, the State presented as corroborative evidence the expert testimony of a psychologist who stated that he had never examined or interviewed the child in question. His testimony consisted of generalities concerning other children that he had examined and their typical behavior. In the instant case, the expert testimony of Dr. Ahart was based on five days of observation, interviews and testing of the two children.

■ The father next maintains that State's evidence was insufficient to support the trial court's finding of abuse. The standard of proof in abuse cases is that applicable to civil proceedings, a preponderance of the evidence. (*In re J.H.* (1987), 153 Ill. App. 3d 616, 505 N.E.2d 1360.) Preponderance of the evidence is proof that leads the trier of fact to find that the existence of the fact in issue is more probable than not. (*People v. Drake* (1985), 131 Ill. App. 3d 466, 475 N.E.2d 1018.) The finding of the trial court upon the issue of abuse should not be disturbed unless contrary to the manifest weight of the evidence. (*In re Brooks* (1978), 63 Ill. App. 3d 328, 379 N.E.2d 872.) The trial court is afforded broad discretion when determining parental rights and responsibilities due to its opportunity to observe the conduct and demeanor of the parties and witnesses. *In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.

Based on the testimony of the boys' caseworkers, teachers, doctors and foster parents, as discussed above, we find that the trial court's decision was not against the manifest weight of the evidence. C.C.'s description of the secret game, his description of semen, and the observations of the boys' teachers, doctors and foster parents established that it was more likely than not that the father sexually abused his children.

■ The father next contends that the trial court erred when at the close of trial it allowed the State to include a count of dependency

in its petition for adjudication of wardship. While the father failed to object to the addition of the dependency count at the time of trial, he did raise the issue in a written post-trial motion and we will therefore address this issue.

The Code of Civil Procedure provides that an amendment of pleadings may be made at any time in order to conform the pleadings to the proof. (Ill. Rev. Stat. 1989, ch. 110, par. 2—616(c).) The decision whether to allow pleadings to be amended after the close of evidence lies within the sound discretion of the trial court, and absent an abuse of discretion, the court's determination will not be disturbed. (*Trident Industrial Products Corp. v. American National Bank & Trust Co.* (1986), 149 Ill. App. 3d 857, 501 N.E.2d 273.) While the trial court's power to allow amendments should be freely exercised, the court should not permit the amendment of a pleading if the amendment alters the nature of proof required to defend (*Blazina v. Blazina* (1976), 42 Ill. App. 3d 159, 356 N.E.2d 164), or the other party would be prejudiced or surprised. (*Trident,* 149 Ill. App. 3d at 866, 501 N.E.2d at 280.) The test for determining whether the trial court properly exercised its discretion is whether allowance of the amendment furthers the ends of justice. *Trident,* 149 Ill. App. 3d at 866, 501 N.E.2d at 280.

We find that it was indeed error for the trial court to permit the State's pleading to be amended to include a dependency count at the close of evidence. Since the father was unaware that a dependency count was to be added until the close of evidence, he was unable to present any evidence to rebut the allegation of dependency. Accordingly, justice is not served by adding a dependency count and the finding of dependency is reversed.

Turning to the mother's contentions, we first address her argument that she is entitled to a new hearing on the petition for supplemental relief because the trial court erred in conducting the adjudicatory hearing on allegations of sexual abuse of the minors by the father simultaneously with the hearing on the petition for supplemental relief regarding visitation between the mother and her minor sons.

The decision whether to sever or consolidate proceedings rests within the sound discretion of the trial court. (*People v. Perry* (1975), 27 Ill. App. 3d 565, 327 N.E.2d 259.) It is defendant's burden to show how she would be prejudiced by a combined trial. (*Perry,* 27 Ill. App. 3d 565, 567, 327 N.E.2d 259, 261.) Although the mother never objected at the time of trial to the dual proceedings or raised it in a post-trial motion, we address this issue in order to insure that the mother received a fair hearing.

There is a strong presumption in a bench trial that the trial court only relied on proper evidence in reaching its decision. (*People v. Glanton* (1975), 33 Ill. App. 3d 124, 338 N.E.2d 30.) In order to rebut this presumption, there must be an affirmative showing on the record that the trial court actually used improper evidence. *People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834.

■ The trial court was presented with ample evidence from which to conclude that visitation by the mother was detrimental to the welfare of her children. However, the record reveals that the trial court's rulings as to the mother were influenced by the evidence of sexual abuse on the part of the father. The trial court stated that the evidence was sufficient to indicate that R.C. was abused and that "his parents create a substantial risk of physical injuries to such Minor." The court further commented that "the parents allowed to be committed against the Minor a sex offense." Because the mother was non-custodial at the time that the father sexually abused his sons, and there is no allegation that the father committed these acts of sexual abuse during the mother's visitation with the children, we cannot conclude from this record that the evidence of sexual abuse by the father had no influence on the trial court's decision to terminate the mother's visitation rights. The remarks by the trial court lead us to believe that the mother was prejudiced by the simultaneous proceedings. For this reason, we reverse the trial court's finding of unable as to the mother and the termination of the mother's visitation rights, and we remand for the trial court to conduct a new hearing, untainted by evidence of sexual abuse by the father, as to the visitation rights of the mother. In light of our decision to remand on this issue, we need not address the other issues raised by the mother.

Affirmed in part; reversed in part and remanded in part.

LORENZ, P.J., and GORDON, J., concur.