FOURTH DIVISION

December 30, 2004

No. 1-03-0497

In re
 MARRIAGE OF ) Appeal from the

BRADLEY GILBERT, ) Circuit Court of

) Cook County.

Petitioner-Appellant, )

) No. 97 D 331700

and )

)

LYNETTE GILBERT, ) Honorable

) Charles E. Porcellino,

Respondent-Appellee. ) Judge Presiding.

JUSTICE GREIMAN delivered the opinion of the court:

The petitioner, Bradley Gilbert, appeals the

decision of the circuit court of Cook County which issued on behalf of the respondent, Lynette Gilbert, a plenary order of protection.  On appeal, Bradley argues (1) the trial court erred in applying section 8-2601 of the Illinois Code of Civil Procedure (735 ILCS 5/8-2601 (West 2002)) in admitting hearsay testimony that he sexually assaulted his daughter; (2) the trial court failed to conduct a reliability hearing with reference to such hearsay, and (3) the hearsay statements lacked the corroboration required by the statute.  For the reasons that follow, we affirm the decision of the trial court.

Bradley and Lynette were married in 1994.  During their marriage, they had two children, a son, C.G., and a daughter, B.G.  On October 17, 1997, Bradley filed a petition for dissolution of marriage.  On March 2, 2000, a judgment for dissolution of marriage was entered.  The parties also executed a marital settlement agreement and a joint parenting agreement, which were both entered on March 2, 2000.  In the joint parenting agreement, the parties agreed that Lynette would serve as the primary residential parent for the couple’s two children.

On August 11, 2000, under the original dissolution case, Lynette filed an 
ex
 
parte
 petition for an order of protection on behalf of C.G. and B.G. against Bradley, pursuant to the Illinois Domestic Violence Act of 1986 (Domestic Violence Act), (750 ILCS 60/214 (West 2000)).  An affidavit in support of the emergency order of protection was attached to the petition.  In the affidavit, it was alleged that, on August 10, 2000, B.G., who was four years old at the time, was visiting Bradley at his home when he sexually abused her.  Specifically, it was alleged in the affidavit that B.G. informed Lynette that during the visit, Bradley’s penis, or "project" as she referred to it, touched her "private parts."  

On August 11, 2000, the trial court found that there were reasonable grounds to believe that abuse had occurred and given the emergency nature of the situation, entered an 
ex
 
parte
 order of protection. 

Thereafter, a hearing on the matter was held.  At that hearing, Lynette testified that on the evening of August 10, 2000, C.G. and B.G. arrived at her home at approximately 8 p.m. after visiting with Bradley.  Later that evening, as Lynette was giving B.G. a bath, B.G. said "'mommy, daddy’s private parts touched my private parts today.’"  Lynette said that prior to B.G. making this statement, she had not been asking B.G. what she had been doing with her father earlier that day.  Lynette testified that this was the first instance that B.G. had ever made such a statement to her.  Lynette said that she was not surprised that B.G. referred to her genitals as "private parts" since this is how she had taught B.G. to refer to them.

After B.G. made this statement, Lynette said that she asked B.G. "What did you just say?"  Lynette then testified that B.G. again said, "'Daddy’s private parts touched my private parts today, mommy.'"  Lynette said that she then took B.G. out of the tub, dried her off, and put some clothes on her so they could sit down and talk in the bedroom.

Once they were in the bedroom, Lynette said that she asked B.G. to tell her what she did with her daddy.  Lynette testified that B.G. explained that "daddy said that he had a project for her to do."  B.G. explained that Bradley also had a project for C.G. to perform, which was scooping dog "poop" in the backyard.  When Lynette asked B.G. what her project was, Lynette said that B.G. began to "withdraw a little bit and say, 'well, I don’t know the words, mommy.'"  Lynette said that she reassured B.G. and just asked her to explain what she did at "daddy’s house."

B.G. then explained "'well, he had this project, and he laid her down on the bed and took off her clothes.  There was a red pillow and a green pillow.  That he then took off his pants or let down his pants and that the project was real little and it got real big.'"  Lynette stated that B.G. was referring to Bradley’s penis as the "project" at first and then as the "finger" so that she became a little confused as B.G. was telling her story.  Lynette said that B.G. said that she "held her mouth like in a circle like uh, and she was real good that she didn’t bite."  When asked what went into B.G.’s mouth, Lynette responded, "She kept calling it the project and the finger.  I was very confused."

Lynette then testified that "[B.G.] kept telling me she didn’t know the words but that it tickled, that when daddy’s private part touched her it tickled.  She showed me it was between her legs and her bottom.  She told me that it touched her bottom.  And I asked her if it hurt.  She said, no, it kind of tickled.  And then I realized it was getting late and I still needed to get the laundry, so I just kind of said well, 'you know, you can tell me anything at any time, right?' And she said, 'yes.'  I said, 'why don’t we go get [C.G.], and let’s go downstairs and get the laundry out of the dryer and come back up.  Its getting late, and I think we need to go to bed.'"

After they retrieved the laundry, Lynette asked B.G. what color the project was, and B.G. responded that it was "brown and purple."  At that point, Lynette said that was the end of their conversation.  After consulting with her parents, she decided to call a doctor.  Thereafter, she called a doctor and made an appointment for B.G. to see him the next day.

The next day, during the doctor’s examination, Lynette said that B.G. refused to answer questions concerning the previous day.  The doctor found no physical injury to the child.  Before they left the doctor’s office, Lynette testified that the doctor informed her that he had an obligation to report the occurrence to the proper authorities.  Lynette testified that she responded, "you do what you have to do."

Later that afternoon, on August 11, 2000, Lynette and her attorney appeared in court to request an emergency order of protection.  Thereafter, she reported the incident to the police.   Later, Lynette said that she had another conversation with B.G.  During the conversation, Lynette testified that she asked B.G., "Now when you were telling me about the project you also called it the finger, where was the project?  Was it this or was the project something different?  And she said 'no,' and she pointed down to her private area.  She said, 'the project was down here.'  I said, okay.  And when you said the project and the finger went in your mouth and you held your mouth like this, but you didn’t bite, was it the finger or was it the project down there?  And she said, 'it was the project down there.'  And I said -- I couldn’t help myself -- I said, 'well, what did you think?'  She said, 'it was yucky.  I told daddy to get it out.'  I said, 'good girl.  Thanks.  You can go play.'"

Thereafter, B.G. was referred to the Children’s Advocacy Center for a victim-sensitive interview on August 15, 2000.  B.G. was interviewed by Caryn Brauweiler, who was the assistant director and had conducted 1,000 interviews of allegedly abused children, 300 of which involved a child under the age of four.  Detective Dave Bruno of the Hanover Park police department, Investigator Ron Miller of the Department of Children and Family Services, and Assistant State’s Attorney (ASA) Ruth Howes of the Cook County State’s Attorney’s office observed the interview through a one-way glass. 

During the interview, B.G. was asked if mommy touched her privates outside of the bathtub and she said "no."  When asked if daddy touched her privates outside of the bathtub, she paused and looked away.  B.G. then responded, "No, he doesn’t." 

Later in the interview, B.G. was asked if anyone touched her where she goes potty, she responded, "Yes."  When asked who, she shrugged her shoulders but did not respond.  When asked to talk about it, B.G. said that she would respond later if she were given some time to color.  Thereafter, B.G. was asked about the touching that happened on her private parts and she stated "I’m scared about it.  Daddy does that."

B.G. was then shown anatomically correct dolls and she was able to correctly identify the parts of the dolls, including their genitalia, which she referred to as private parts.  Then the interviewer reminded B.G. that they were going to talk about the kind of touching that was scary for her.  B.G. responded, "Mom told me if dad touched my private again, I should scream."  When asked if that really happened, B.G. stated, "One time he does, a lot of times he does."  When asked where this occurred, B.G. stated, "In his bedroom."  B.G. then stated that it occurred "In his bed."  B.G. then said that her father took her clothes off and that he took his own underwear off.

When asked what happened next, B.G. stated that, "He stuck his private there," as she pointed to her vagina and buttocks.  When asked what her father’s private’s looked like, B.G. responded, "It looks like a boy’s private."  When she was asked if it looked liked the doll’s private, she stated, "It was sticking up."  She spontaneously added, "C.G. was picking Lady’s poop up."  When asked where her father’s fiancee was at when this occurred, B.G. responded that she was at work.

B.G. than had the interviewer draw her so that she was lying on her stomach on her father’s bed.  When asked what happened, she stated, "He put his private on my bottom and stuck it through my legs, and put it here on my private."  When asked how it felt, she said "silly."  When asked if anything came out of his privates, she responded, "Let’s not talk about it.  It’s yucky."

Later, B.G. began playing with the anatomically correct dolls.  During this time, Brauweiler asked B.G. to show her how daddy touched her.  B.G. took the small female doll and put it on the floor facedown.  She pulled the underwear off and took the large male doll, pulling his pants off, and inserted the penis in the rectum of the small female doll.  She then explained that daddy then put his private between her legs and said that it touched her on the private.  She then stated, "Let’s not talk about it.  I’m scared."

Bradley testified that on August 10, 2000, he picked up both B.G. and C.G. from Lynette’s house.  He said that he spent approximately two hours alone with the children, outside the presence of his fiancee.  He explained that during this time he gave C.G. a "project" to do, which was to scoop their dog’s "poop" up in the backyard.  He stated that C.G. did this task for approximately five minutes.  He stated that he did not assign a task to B.G.  Bradley said that he used the term "project" because of his job.  

He denied ever going into a bedroom with B.G.  He stated that there were no red or green pillows in the bedroom at his home.  He denied having any sexual contact with B.G.  He stated that B.G. never touched his penis.  He stated that he had never touched her private parts in an inappropriate way.

Nancy Mulso testified that she was an employee of Judicial Monitoring Resources (JMR) an organization appointed by the trial court to supervise visitation.  Mulso stated that JMR provided services to Bradley and the children after the allegations of abuse had been levied.  As an employee of JMR, it was Mulso’s job to observe the visitation periods that Bradley had with his children.

Mulso testified that Bradley's behavior during visits with his children was appropriate.   Mulso testified that when B.G. visited with her father at the Schaumburg library, the child was reluctant to return to her father and stated she was afraid of him.  When asked why by Ms. Mulso, B.G. stated "because he did that bad thing."  Mulso testified that during one particular visit, B.G. asked Bradley, "[W]hy did you do that?"  And he said, "[W]hy did I do what?"  B.G. responded, "Why did you touch me when you weren't supposed to?" And he said "[W]hen did I do that?" And she said, "[M]ommy said you did."  And he said, "[W]ell you'll have to ask mommy when it happened because I didn't do it."  

Mulso further testified that on a separate visit, while Bradley and the children were at an ice cream shop, "the children told [Bradley] that he wasn't going to heaven, he was going to hell because he didn't have Jesus in his heart."

On another visit Mulso overheard C.G. telling B.G. that she had to watch out what she said in front of Mulso, "that she's  [B.G.] not supposed to say things in front of us that mommy said."

Ron Miller, an investigator with the Department of Children and Family Services, observed that in his experience he had never found a case where a four year old was able to make false allegations of sexual abuse.

Following the hearing, on September 10, 2002, the trial court issued a memorandum order.  In the order, the trial court initially stated that the matter was "coming on to be heard upon the petition of Lynette Gilbert for an order of protection filed on August 11, 2000."  Although improperly captioned Lynette Gilbert v. Bradley Gilbert, it was filed under the original dissolution case number wherein Bradley filed as petitioner and Lynette was the respondent.  In the order, the trial court determined that B.G. had been abused by Bradley.  The trial court issued a plenary order of protection pursuant to section 220 of the Act, which it incorporated into the March 20, 2000, final judgment for dissolution of marriage.  The trial court further provided that visitation with the children would "continue subject to Bradley's compliance with the court's order regarding the counseling program of the Social Service Department."

Thereafter, Bradley filed a petition to vacate, modify, reopen, or reconsider the order entered on September 10, 2002, pursuant to section 2-1203 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1203 (West 2002)), which the trial court denied on December 19, 2002.

On January 17, 2003, Bradley timely filed his notice of appeal wherein he appealed the trial court’s orders of September 10, 2002, and December 19, 2002.

On appeal Bradley argues that it is inappropriate to enter an order of protection pursuant to the provisions of the Illinois Domestic Violence Act of 1986 that would vary the visitation rights determined in the dissolution proceedings.  Although at least one Illinois case in the Third District, 
Radke v. Radke
, 349 Ill. App. 3d 264 (2004), held that the Illinois Domestic Violence Act had been inappropriately used to alter the defendant's visitation with his minor child, we are not faced with that problem in this case.  Here the order of protection was filed under the original dissolution case number so that the thoughtful opinion of the trial court was entered pursuant to that initial dissolution case.

Moreover, in 
Radke
, the court determined that the substance of the plaintiff's complaint was not proven so that the issue of the application of the Domestic Violence Act was, in essence, 
dicta
.

Even if the petition had not been filed under the original dissolution case number, the Domestic Violence Act does not impose any jurisdictional limitations.  Section 103(6) of the Domestic Violence Act defines family or household members as any "children" without any reference to previous dissolution proceedings.  750 ILCS 60/103(6) (West 2002).

Similarly, section 205(a), in determining the applicability of the rules of civil procedure, references "[a]ny proceeding to obtain, modify, reopen or appeal an order of protection, whether commenced alone or in conjunction with a civil or criminal proceeding, shall be governed by the rules of civil procedure of this [s]tate."  750 ILCS 60/205(a) (West 2002).  Here, again, the drafters suggest that domestic violence proceedings may be commenced in conjunction with other civil proceedings or when another action is pending.

Reference is again made in section 210(a) dealing with process that relates to an action "commenced alone or in conjunction with another proceeding."  750 ILCS 60/210(a) (West 2002).  Similarly, section 210.1 refers to seeking an order of protection in conjunction with a pending civil case.  750 ILCS 60/210.1 (West 2002).

The trial court's thorough order provides Bradley with every opportunity to submit recommendations for reasonable alternative arrangements for supervised visitation of the minor children of the parties as well as providing obligations of petitioner to be involved with social service agency supervision and counseling.

Petitioner argues that the trial court erred in admitting into evidence the hearsay evidence of B.G.'s statement as to the sexual abuse imposed by Bradley.  While generally hearsay statements are not admissible to prove certain conduct, the Illinois General Assembly has established certain statutory exceptions to the hearsay rule in connection with alleged child abuse.

Section 606(e) of the Illinois Marriage and Dissolution of Marriage Act provides that "[p]revious statements made by the child relating to any allegations that the child is an abused or neglected child *** shall be admissible in evidence in a hearing concerning custody of or visitation with the child.  No such statement, however, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect."  750 ILCS 5/606(e) (West 2002).

The Domestic Violence Act provides that the rules of civil procedure shall be applicable to domestic violence actions (750 ILCS 60/205 (West 2002)).  With that in mind, we note that section 8-2601(a) of the Illinois Code of Civil Procedure states "[a]n out-of-court statement made by a child under the age of 13 describing any act of child abuse or any conduct involving an unlawful sexual act *** is admissible in any civil proceedings, if *** the child *** is unavailable as a witness and there is corroborative evidence of the act which is the subject of the statement."  735 ILCS 5/8-2601(a) (West 2002).

A similar provision with almost identical language is contained in the Juvenile Court Act of 1987 (Juvenile Court Act)  705 ILCS 405/2-18(4)(c) (West 2002)).

Although the relief sought in the instant petition refers to the Domestic Violence Act, the essence of the court's ruling clearly implicates questions of custody and visitation.  Accordingly, we find section 606(e) of the Illinois Marriage and Dissolution of Marriage Act would apply.  
In re Marriage of Rudd
, 293 Ill. App. 3d 367 (1997).

We recognize that if this were a proceeding under the Domestic Violence Act, it might be argued that the guiding rules are those set out in the Domestic Violence Act or perhaps even those set out in the Illinois Code of Civil Procedure.

In examining the cases, it does not seem to make a difference.  All of the statutes relate to statements of abuse by the child and the requirement that there must be corroborating evidence.

However, we believe that section 606(e) of the Illinois Marriage and Dissolution of Marriage Act is the appropriate statute to consider in relation to these hearsay statements because the instant petition was brought under the name and title of the original dissolution petition.  750 ILCS 5/606(e) (West 2002).  

Next, we consider whether it was error for the trial court not to conduct a reliability hearing with reference to B.G.'s hearsay.  Section 606(e) of the Illinois Marriage and Dissolution of Marriage Act does not provide for a reliability hearing and we find that none is required in a bench trial.  Of the several acts dealing with hearsay of an allegedly abused child, only section 8-2601(a) provides that the statements shall be admitted only if "the court conducts a hearing outside the presence of the jury and finds that the time, content and circumstance of the statement provide sufficient safeguards of reliability."  735 ILCS 5/8-2601(a) (West 2002))  Subsection (b) of 5/8-2601 sets forth the content of instructions to the jury where such a statement has been allowed into evidence.   Section 8-2601 contemplates use of the hearsay statements in jury trials and seemingly imposes the reliability hearing in these matters. Since no such provision is set forth in section 606(b), we do not believe the requirement is imposed upon the trial courts hearing matters under the Illinois Marriage and Dissolution of Marriage Act.  

Even if such a hearing was required in jury cases, in a bench trial the trial judge is presumed to have considered the time, content and circumstances under which the statement was made in determining the reliability of the statements.  
People v. Hart
, 214 Ill. App. 3d 512 (1991).  In the 
Hart
 case, the failure to hold a separate hearing in a bench trial was harmless error.  It is difficult to imagine that the plethora of evidence and testimony surrounding B.G.'s statement would not satisfy the safeguards of reliability as to time, content and circumstances of their making.  
In re Marriage of Rudd
, 293 Ill. App. 3d 367 (1997).

Lastly, we address Bradley's claim that the B.G.'s hearsay statements lack the corroboration required by the statute.  

In 
In re A.P.
, 179 Ill. 2d 184 (1997), which was a case arising under the Juvenile Court Act, our supreme court acknowledged that the "form of corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence."  
In re A.P.
, 179 Ill 2d at 199.

The language of the governing statute under the Illinois Marriage and Dissolution of Marriage Act contains precisely the same language as that set forth in the Juvenile Court Act.

The trial court properly relied heavily upon two cases.  In the First District case 
In re C.C.
, 224 Ill. App. 3d 207 (1991), as in the case at bar, C.C. told his story of his father's sexual abuse.  The court determined there was appropriate corroboration where the declarant, playing a game with puppets, described the sexual activity of his father, a social worker observed him playing that game, and an interdisciplinary group made up of child rights specialists, psychologists, social workers, psychiatrists and nurses examined the activities of the declarant, and although there were no physical issues noted, they concluded from their interviews, evaluations and observations that the declarant was a victim of sexual abuse.  The conclusion was reached in part by C.C.'s discussion about touching his penis, touching his father's penis when both were erect and then soft again, and about "'yellow stuff.'" 
In re C.C.
, 224 Ill. App. 3d at 210.

In evaluating the minor's out-of-court statements, the 
In re C.C.
 court determined that these evaluations and observations were corroborative evidence within the purview of an earlier case, 
In re K.L.M.
, 146 Ill. App. 3d 489 (1986).

In 
In re K.L.M.
, the court found sufficient corroboration in the testimony of caseworkers and a psychotherapist that the four year old child was anxious, that the child would have had limited opportunity to have learned about sexual matters that she purported to describe, and that there was some skin irritation in her genital area.

A recent case would suggest a different outcome.  In 
In re Marriage of Flannery
, 328 Ill. App. 3d 602 (2002), the court determined that merely observing the physical evidence of the child's hearsay statements of sexual abuse, such as using puppets or other "games," was insufficient to provide corroboration under any of the operative statutes.  The statements relating to observation of the child were also hearsay.

If the 
Flannery
 case is bedrock precedent, it would be almost impossible to obtain a finding of sexual abuse unless there was some physical evidence on the body of the child or unless the abuser had other witnesses to his abuse, a matter that is certainly unlikely.

The trial court had available the observation of Caryn Brauweiler, the assistant director of the Child Advocacy Center of Northwest Cook County, who has, as we have noted, conducted 1,000 interviews of allegedly abused children, 300 of which involved a child under the age of four.  She witnessed B.G.'s use of anatomically correct dolls to demonstrate the abuse, noting that B.G. was able to discuss the fact that Bradley's penis was "sticking up."  She also was the person who responded to B.G.'s request to draw a picture of B.G. lying in her father's bed and a physical demonstration of what happened to her in that position.

Additionally, there was the observations of the victim sensitive interview by Detective David Bruno of the Hanover Park police department and DCFS Investigator Ron Miller, who observed that in his experience he had never found a case where a four year old was able to make false allegations of sexual abuse, particularly in view of the lengthy details and complex victim-sensitive interview.  He also observed B.G. discussing the "touching" before the dolls were brought out.

Perhaps the most compelling testimony is that of Nancy Mulso of the Judicial Monitoring Resources, who observed B.G. confronting Bradley with respect to allegations of abuse.  It is difficult to imagine that a four year old would confront her father over deeds that never happened. 

Moreover, B.G. visited with her father at the Schaumburg library and as she was reluctant to return to her father, she stated she was afraid of him.  When asked why by Ms. Mulso, she responded "because he did that bad thing."

Additionally, Bradley used the word "project" often in speech and B.G. used it in identifying the incident as a "project," as well as in referencing genitals as a "project."

The trial court also noted the improbability that B.G. would be aware of knowledge about a penile erection in that it would be "real little and then it would get real big" or that she had some knowledge of ejaculation as evidenced by her comment, "Let's not talk about it. It's yucky."

All of the above fall within the ambit of the First District case 
In re C.C.
 and the Fourth District case 
In re K.L.M.
.

Bradley suggests that Lynette had motivation to fabricate the entire scenario and that during the course of the dissolution proceedings, she threatened to raise issues of interfamily sexual abuse that had occurred in Bradley's family.  To the contrary, the trial court's opinion states that "there is no evidence of any motivation in this child or the mother to fabricate this story."  The trial court goes on to note that Lynette was aware of Bradley's relationship with his fiancee for a very long time.

The trial court had an opportunity to hear the evidence, view the witnesses and make judgments as to their credibility, and in its well-considered order, it stated that the evidence "is just simply not enough to form a basis to conclude there was fabrication, or to infer it from these facts."  Additionally, the trial court suggests the young age of the child and the facts of the case make it unlikely that the child fabricated.

Based upon the record before us, we cannot say that the trial court's findings were against the manifest weight of the evidence.

Affirmed.

QUINN, J., concurs.

REID, P.J., dissents. PRESIDING JUSTICE REID dissenting:

I dissent.  I would reverse and remand this matter with directions to vacate the order of protection.

The first issue I will address is whether Lynette’s use of an order of protection to alter Bradley’s visitation rights with regards to B.G. was proper.  Here, I believe that 
Radke v. Radke
, 349 Ill. App. 3d 264 (2004) and 
Wilson v. Jackson
, 312 Ill. App. 3d 1156 (2000) are very instructive.

In 
Radke
, the petitioner, Kathryn, was formerly married to the respondent, Ross.  Following the dissolution of their marriage, Kathryn was granted residential custody of the parties’ 12-year-old daughter, Laine.  Ross was granted visitation.  

Thereafter, Kathy filed a petition for an order of protection on behalf of Laine.  Kathryn sought, 
inter
 
alia
, an order prohibiting Ross from abusing, harassing or intimidating Laine.  The trial court subsequently issued an emergency ex parte order of protection.

At the subsequent hearing on the petition, Laine testified that she visited her father in January 2003.  At that time, she informed Ross that she did not enjoy spending time at his home and that she wanted to return to her mother’s house.  When she attempted to call her mother, Ross “ripped the telephone off of the wall” and grounded her.  

Thereafter, Laine said that she attempted to leave and walk to her mother’s house.  When she did, Ross followed her outside, held her arms behind her back, then pushed her inside and into her room.  Laine testified that Ross attempted to hit her, but said that she was able to avoid contact by moving backwards.  She also said that she suffered a bruise on her arm as a result of this incident.

At the conclusion of the hearing, the trial court found that issues of visitation would not be addressed in the order of protection.  “The court specifically noted that it would not restrict Ross’s visitation, correctly recognizing that the purpose of an order of protection, ‘is to protect, not to effectuate changes in visitation.’”  
Radke
, 349 Ill. App. 3d at 267.

The court accepted Laine’s testimony that physical force had been used to prevent her from returning to her mother’s house, and that Ross had denied her access to a telephone to call her mother.  The trial court determined that Ross had improperly prevented Laine from calling Kathryn.  Consequently, the court entered a plenary order of protection requiring Ross to refrain from physical abuse, harassment, intimidation or interference with the personal liberty of his daughter for two years from the date of the order.  
Radke
, 349 Ill. App. 3d at 267.

On appeal, Ross argued that: (1) the trial court abused its discretion in granting the order of protection because the evidence failed to establish that he had harassed his daughter, and (2) the order of protection should be vacated because any action to restrict his visitation with his daughter should have been taken under the existing dissolution action rather than by obtaining an order of protection.  The 
Radke
 court rejected the trial court’s legal conclusion that Ross’ action of denying Laine the ability to use the phone under the circumstances constituted harassment.  
Radke
, 349 Ill. App. 3d at 268.

The Radke court then turned to the question of whether or not the order of protection should be vacated because any action to restrict his visitation should have been taken under the existing dissolution action rather than by obtaining an order of protection.  The 
Radke
 court agreed with Ross.  Its reasoning follows:

“The primary purpose of the Domestic Violence Act is to aid victims of domestic violence and to prevent further violence. 750 ILCS 60/102 (West 2002); 
Wilson v. Jackson
,
 312 Ill. App. 3d 1156 (2000).  Obtaining an order of protection is not the proper procedure for resolving child custody or visitation issues.  Those issues should be resolved under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 
et
 
seq
.
 (West 2002)).  
Wilson
,
 312 Ill. App. 3d 1156 (citing 
In re Marriage of Gordon
,
 233 Ill. App. 3d 617 (1992)).
 In 
Wilson
,
 this court found that the petitioner's primary purpose in seeking an order of protection was to obtain visitation and custody of his child rather than to prevent abuse.  We vacated the order of protection granted by the trial court due to the petitioner's misuse of the Act, as well as insufficient evidence of abuse.  
Wilson
,
 312 Ill. App. 3d 1156.

In this case, Kathryn admitted that she obtained the order of protection to temporarily suspend visitation.  Laine also indicated that the order of protection was sought so that she could see her father only when she wanted to see him.  The Domestic Violence Act is not the appropriate vehicle for resolving such issues.  We note that the order of protection did not restrict Ross's visitation or contact with Laine.  The court narrowly drafted the order to prohibit physical abuse, harassment, interference with personal liberty or intimidation.  Nevertheless, based on this record, we believe that Kathryn misused the Domestic Violence Act for the purpose of attempting to alter Ross's visitation with Laine.  For that reason, and because we find that no harassment occurred, we reverse the judgment of the circuit court and vacate the order of protection.”  
Radke
, 349 Ill. App. 3d at 268-69.

In 
Wilson
, the petitioner sought an 
ex
 
parte
 order of  protection under the Domestic Violence Act in order to obtain custody of his daughter.  The 
Wilson
 court determined that the petitioner misused the Domestic Violence Act as a means to obtain possession and custody of his daughter from his ex-girlfriend.  The ruling of the 
Wilson
 court follows:

“In this case petitioner could have filed a petition for visitation or custody under the Parentage Act (see 750 ILCS 45/6(e) (West 1998)) or the Marriage Act (see 750 ILCS 5/601(b)(1)(ii) (West 1998)).  Instead, petitioner waited until he had physical custody of the child and then sought an 
ex parte
 order of protection.  A careful review of the entire record convinces this court that petitioner's primary purpose in seeking an order of protection was not to prevent abuse but was to obtain visitation with and custody of the child.  While petitioner's desire to be a part of his child's life is laudable, obtaining an order of protection is not the proper procedure for establishing visitation.  Petitioner's misuse of the Domestic Violence Act in this manner warrants reversal of the plenary order of protection entered in this case. 
 
Cf. Gordon
,
 233 Ill. App. 3d at 648(‘We would be justified in reversing the judgment on the grounds that the judge exceeded his statutory authority and that the Domestic Violence Act was misused * * *.’).  We emphasize that not every case of improper use of the Act would require reversal.  It is both the misuse of the Act, and the dearth of evidence of abuse, as explained below, that compel reversal.”  
Wilson
, 312 Ill. App. 3d 1156 at 1164-65.

The Illinois Marriage and Dissolution of Marriage Act (IMDMA) provides parents with certain safeguards and protections which they are not afforded under the Domestic Violence Act.  Under the IMDMA, in order to modify a parent’s custodial rights, proper notice must be given and a subsequent hearing must be held.  (750 ILCS 5/610(b) (West 2000)); (750 ILCS 5/601(c) & (d)(West 2000)); (750 ILCS 5/603 (West 2000)).

This is not so under the Domestic Violence Act.  Under the Domestic Violence Act, a parent can 
circumvent the protections guaranteed under the IMDMA.  In effect, the Domestic Violence Act could be used as a short cut which would effectuate an 
ex
 
parte
 change of status which would modify the status 
quo
 
ante
.  In circumstances such as this one, the Domestic Violence Act could be abused and I do not believe that it was intended to be used this manner.

Here, there was an agreed order between Bradley and Lynette which delineated both of their parental rights.  If Lynette believed that Bradley was abusing B.G., instead of filing an 
ex
 
parte
 petition seeking an order of protection on behalf of C.G. and B.G. against Bradley pursuant to the Domestic Violence Act, I believe that Lynette should have filed an emergency petition to change child custody and visitation under 750 ILCS 5/603 (West 2000).

Like the petitioners in 
Radke
 and 
Wilson
, Lynette improperly sought an order of protection in order to suspend or alter Bradley’s visitation rights with his daughter.  As stated in both 
Radke
 and 
Wilson
, 
the Domestic Violence Act is not the proper statute to use to alter a parent’s visitation rights with their child.  That is precisely what Lynette did.  As such, the trial court’s order of protection should be vacated. 

The majority attempts to distinguish 
Radke
.  Initially, the majority states that 
Radke
 is inapplicable to this set of facts because  “[h]ere the order of protection was filed under the original dissolution case number so that the thoughtful opinion of the trial court was entered pursuant to that initial dissolution case.”  However, the majority overlooks the fact that although the order of protection was originally filed under the original dissolution case number, the trial court went on to acknowledge that “a search of the court file fails to disclose any response to the currently pending petition.”  The trial court then went on to set out and analyze the pertinent issues involved and held that “in accordance with section 220(i)(ii) of the Illinois Domestic Violence Act the said plenary order of protection entered on even date herewith shall remain in effect until vacated or modified by this Court.”  The trial court also incorporated the plenary order into the final judgment for dissolution of marriage.  The majority cannot ignore the fact that the trial court used the Illinois Domestic Violence Act to alter the Bradley’s visitation rights with his daughter.

Furthermore, the majority attempts to characterize the holding in 
Radke
 which concerned the application of the Domestic Violence Act as 
dicta
.  This is just simply erroneous.  A reading of the decision in 
Radke
 shows that its holding with regards to the Domestic Violence Act is also the law of the case.  
Radke
, 349 Ill. App. 3d at 268-69.

Furthermore, I do not believe that B.G.’s statements were properly corroborated. 

Section 606(e) of the IMDMA states that:

“Previous statements made by the child relating to any allegations that the child is an abused or neglected child within the meaning of the Abused and Neglected Child Reporting Act, or an abused or neglected minor within the meaning of the Juvenile Court Act of 1987, shall be admissible in evidence in a hearing concerning custody of or visitation with the child.  No such statement, however, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect.”

“In 
In re A.P.
,
 179 Ill. 2d 184 (1997), our supreme court discussed the evidence necessary to corroborate a minor's hearsay statement of sexual abuse.  The purpose of presenting corroborating evidence, the court wrote, was to balance the welfare interests of minors and the rights of those accused of abuse or neglect.  
In re A.P.
,
 179 Ill. 2d at 197.  The court noted that sufficient corroboration requires more than witnesses testifying that a minor related instances of abuse to them.  
In re A.P.
,
 179 Ill. 2d at 198.  The court stated:

‘[C]orroborating evidence of * * * abuse or neglect requires there to be independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred.  In essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected.  The form of the corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence.’  
In re A.P.
,
 179 Ill. 2d at 199.”  
In re Marriage of Flannery
, 328 Ill. App. 3d 602, 610 (2002).

The trial court in the case, 
sub
 
judice
, determined that the hearsay statements were corroborated with the following evidence: (1) B.G.’s use of anatomically correct dolls to describe what took place, (2) B.G.’s use of the term “project” to describe Bradley’s penis, (3) B.G.’s statement that Bradley’s project was “real little then it got real big,” (4) B.G. statement that Bradley’s privates were different than that of the anatomically correct doll because his was “sticking up,” and (5) when B.G. was asked if anything came out of Bradley’s privates, she responded, “Let’s not talk about it.  It’s yucky.”

In finding that there was corroborating evidence, the trial court relied heavily on the cases of 
In re C.C.
, 224 Ill. App. 3d 207 (1991) and 
In re K.L.M.
, 146 Ill. App. 3d 489 (1986).  The trial court considered but refused to follow the decision reached in 
In re Marriage of Flannery
, 328 Ill. App. 3d 602 (2002), which distinguished both 
In re C.C.
 and 
In re K.L.M.
  Taking our particular set of facts into consideration, I believe that 
Flannery
 is more persuasive.

In 
Flannery
, a mother alleged that her three-year-old daughter, Amanda, informed a social worker that “daddy put his finger in my buddy butt (vagina) and hurt me.”  A physical examination of the girl revealed that she suffered vaginal redness.  However, the pediatrician who examined the child testified that vaginal redness is quite common among 2 1/2 year- old-girls, and explained that there were a lot of things which could explain the cause of the girl’s vaginal redness.  Except for the vaginal irritation, the pediatrician was unable to find anything abnormal.

Furthermore, there was evidence that Amanda, who was potty trained, began to “have accidents” around the time of the alleged abuse.  There was testimony that Amanda began waking up in the middle of the night.  There was testimony that after Amanda initially informed her mother of the abuse, she made further statements which suggested that her father had abused her.  There was also testimony from a social worker who conducted a sexual-abuse-victim assessment of Amanda.  The social worker, 
inter
 
alia
, testified about Amanda’s physical actions when she spoke about the alleged sexual abuse she suffered from her father.

The trial court determined that there was sufficient evidence to corroborate Amanda’s hearsay statements.  The trial court noted that the corroborating evidence consisted of physical evidence and testimony regarding Amanda’s physical actions when she relayed the statements of abuse.  
Flannery
, 328 Ill. App. 3d at 605.

In reversing the trial court, the 
Flannery
 court determined that there was inadequate physical evidence and testimony concerning the physical actions of the child when she relayed the statements of abuse to corroborate the hearsay statement under section 8-2601.  
Flannery
, 328 Ill. App. 3d at 610-613.  A portion of the 
Flannery
 court ruling follows:

   “[T]his court has previously determined that evidence that is itself hearsay cannot provide the corroboration required by the statute.
  
In re Alba
,
 185 Ill. App. 3d 286, 290 (1989).  Although hearsay is defined as testimony of an out-of-court ‘statement’ that is offered to establish the truth of the matter asserted (
People v. Garcia
,
 195 Ill. App. 3d 621, 626 (1990)), we have applied this definition to physical manifestations as well.  See 
Alba
,
 185 Ill. App. 3d at 290 (finding that child's drawing indicating where her father placed his penis was insufficient to corroborate the child's hearsay statement of sexual abuse; the drawing constituted hearsay because it was offered to establish the truth of the matter asserted).  In this case, Amanda's physical actions were offered to prove petitioner's claim that Amanda was sexually abused.  Accordingly, the actions fit within the definition of hearsay and could not, by themselves, corroborate Amanda's out-of-court statements of sexual abuse.  A contrary holding would effectively nullify the corroboration requirement.  Thus, we hold that testimony regarding the physical manifestations that accompany a child's hearsay statements of abuse is insufficient to corroborate the out-of-court statements when the child's conduct is the only corroborative evidence presented.  Consequently, we must reverse the judgment of the trial court.

* * *

Petitioner first relies on 
In re K.L.M.
,
 146 Ill. App. 3d 489 (1986).  In 
K.L.M.
,
 the court found that the minor child's hearsay statements of sexual abuse by her father were corroborated by (1) testimony of a caseworker for the Department of Children and Family Services and a psychotherapist that the girl was anxious when she related the allegations of abuse; (2) the testimony of the child's father, who indicated that the four-year-old had limited opportunity to have learned about the sexual matters that she purported to have described; (3) testimony that the minor's mother had no opportunity to arrange for the child to provide false testimony; and (4) testimony that the girl had a skin irritation in the genital area.  
K.L.M.
,
 146 Ill. App. 3d at 493-94.  Importantly, however, the court pointed out that the child was able to describe semen.  
K.L.M.
,
 146 Ill. App. 3d at 494.  The court believed that the child would have been unable to describe semen unless she had seen it and that it would have been unlikely that she had seen semen unless the events she related had actually taken place.
 Petitioner also cites 
In re C.C.
,
 224 Ill. App. 3d 207 (1991).  
C.C.
 involved the alleged sexual abuse of two minors, R.C. and C.C., by their father.  In 
C.C.
,
 the court found that the minors' out-of-court statements of sexual abuse were corroborated by testimony that C.C. had used anatomically correct puppets to recreate a ‘secret game’ he played with R.C. and his father.  Moreover, the five-year-old C.C. was able to describe semen, and there was testimony that the behavior of C.C. and R.C. began to change while living with their father.  For instance, C.C. began crying over insignificant things, he wet his pants every day, he became less affectionate, he did not want to be touched, he stopped doing schoolwork, and he was hard to motivate.  The seven-year-old R.C. frequently wet his pants, had bowel movements in his pants, had frequent tantrums, often cried and whined, and would not let anyone hug him.  Further, a medical team interviewed, observed, and psychologically tested both boys.  The team then compiled a ‘composite picture’ of the children and concluded that they had been sexually abused.  Based on this evidence, the court concluded that it was more probable than not that the children were sexually abused by their father.  
C.C.
,
 224 Ill. App. 3d at 215.
 We find petitioner's reliance on 
K.L.M.
 and 
C.C.
 misplaced. In both of those cases there was a myriad of factors beyond the children's physical manifestations that, when taken together, could support a finding of corroboration.  Here, the trial court found only two factors corroborated Amanda's hearsay statements. However, we have already concluded that there was no physical evidence to corroborate Amanda's hearsay statements of sexual abuse.  Thus, we are left only with Amanda's physical manifestations.  As noted above, there is no authority supporting a finding of corroboration based on the child's physical conduct alone, and we decline to impose such a finding here.”  
Flannery
, 328 Ill. App. 3d at 612-14.

Here, I believe the trial court improperly determined that the hearsay statements in question had been corroborated.  The trial court made this erroneous determination because it only relied on further hearsay to corroborate the original hearsay statements.  Taking into consideration the particular set of facts before us, I cannot agree with the decision reached by the majority and the trial court.

In this matter, there was absolutely no physical evidence that corroborated the hearsay statements.  Furthermore, the day after the abuse allegedly occurred, when Lynette initially took B.G. to the doctor for an examination, B.G. made no statements to the doctor concerning any alleged abuse.  Thereafter, during B.G.’s victim sensitive interview with Brauweiler, initially B.G. unequivocally informed Brauweiler that Bradley had never touched her privates outside of him giving her a bath.

Moreover, it appears that the trial court failed to realize that Lynette was the only person to state that B.G. referred to Bradley’s penis as a “project.”  During B.G.’s interview with Brauweiler, B.G. never referred to Bradley’s penis as a “project.”  The only person who did so was Brauweiler, which occurred when Brauweiler asked B.G. “if daddy had asked her about a special project,” and B.G. response was “Yes.”  However, B.G. also added “I don’t know what it is and we’re not going to talk about it.”  

Lynette was also the only person to say that B.G. informed her that Bradley put his penis in her mouth.  This accusation was never repeated by B.G. to anyone other than Lynette.  We find this to be unsettling in this matter because there was evidence given by Mulso of JMR which suggested that Lynette may have been in fact coaching B.G. as to what she should say.  It also appears that the trial court failed to adequately consider Bradley’s allegations that before their divorce, Lynette had threatened to use his family history of sexual abuse, 
i.e.
, his father molesting his sister, against him with regards to the custody of their children.

Furthermore, it also appears that the trial court as well as the majority have ignored the evidence which suggested that Lynette had a strong motive to lie about the alleged abuse.  For instance, Lynette admitted that she prevented Bradley from having normal unsupervised visits with the children until he obtained a court order in the context of the divorce proceedings.  There was also evidence the Lynette did not like Bradley’s fiancee, Jennifer Ann Licka, and that she did not want her around the children.  

Licka also testified that she saw the children on the day that the alleged abuse occurred.  In fact Licka saw the children after the abuse allegedly occurred.  Licka stated that she did not see anything unusual about the children’s behavior.  Licka stated that she was with the children for four hours until they returned home that particular evening.  Also, Licka testified that on the day of the alleged abuse, she and Bradley informed the children that they would be getting married and also informed them that they would be participating in the wedding.  After this conversation, B.G. then asked if she could come and live with her and Bradley.

As such, I disagree with the majority and believe that in this particular case, the hearsay statements were not sufficiently corroborated.